927 A.2d 40

**Hal STANLEY**

v.

**Minnie L. STANLEY, et al.**

**No. 1981 Sept.Term, 2005.**

Court of Special Appeals of Maryland.

July 2, 2007.

Victor H. Laws, III (S. James Sarbanes, Laws & Robertson, PA, on the brief), Salisbury, MD, for Appellant.

Ronald G. Rayne, Salisbury, MD, for Appellee.

Panel: BARBERA, WOODWARD, and ROBERT L. KARWACKI, (Retired, specially assigned), JJ.

BARBERA, Judge.

We are presented with the opportunity to examine the "Multiple-party account" provision of the Financial Institutions Article. Md.Code (1980, 2003 Repl. Vol.), § 1–204 of the Financial Institutions Article ("FI"). FI § 1–204 was enacted

in 1992 to resolve uncertainties in the common law concerning ownership of funds residing in a multiple-party account upon the death of the account holder. To date, no reported decision of this Court or the Court of Appeals has construed the statute.

This case involves ownership of the funds in five multiple-party bank accounts that were established by George W. Stanley ("Decedent"). The parties to the dispute are surviving family members of Decedent. Appellant is Hal Stanley, Decedent's brother. Appellees are Minnie L. Stanley, Decedent's wife from a second marriage, and her children from a previous marriage, Laura Bradley and Leslie Armstrong.

The parties disagree about the ownership of monies that Decedent deposited in the five accounts. Decedent had made appellant and appellees joint owners on each of those accounts. Upon the death of Decedent, appellees emptied the accounts and placed the monies in a newly opened account in their names. Appellant claims ownership of twenty-five percent of those monies, as one of the four surviving parties to the accounts.

The dispute prompted an action in the Circuit Court for Wicomico County. Both sides relied upon FI § 1–204. Each side, however, urged an interpretation of that section different from the other. The circuit court agreed with appellees' interpretation of FI § 1–204 and, applying that interpretation to the case, granted summary judgment in appellees' favor.

Appellant challenges the court's judgment on several grounds, including that the court made an error of law when it granted summary judgment in favor of appellees. He argues that the court wrongly construed FI § 1–204 and that proper construction of that provision dictates that he, not appellees, should have been awarded summary judgment. For the reasons we shall explain, we agree with appellant. We therefore shall vacate the judgment and remand the case with the direction, rare for an appellate court, that the circuit court enter summary judgment in favor of appellant.

## I.  BACKGROUND AND PROCEEDINGS

Decedent established the five bank accounts at issue in the case years before his death.  Two of the accounts are certificate of deposit accounts, two are checking accounts, and one is a savings account.  Decedent was the source of all funds in the accounts, which were maintained at Peninsula Bank (now Mercantile Peninsula Bank).  Decedent originally titled the accounts in his name and the names of his first wife and their children, Shirley and Judy.  Decedent's first wife died in 1995.

Later that year, Decedent married appellee Minnie Stanley.  Minnie Stanley had two children by a previous marriage, appellees Laura Bradley and Leslie Armstrong.  In 2002, by which time both of Decedent's daughters had died, Decedent re-titled the accounts in his name and the names of his brother, appellant Hal Stanley, and appellees Minnie Stanley, Laura Bradley, and Leslie Armstrong.  The changes in ownership and the form of the accounts are shown by signature cards, account terms and conditions, the rules and regulations of the bank governing the accounts, and other account information filed in support of the parties' motions for summary judgment.  Those documents reflect that Decedent was designated on the accounts as the "primary owner," and appellant and appellees were designated as the "secondary owner[s]."  We shall say more about these account documents later in this opinion.

During Decedent's lifetime, the account statements were sent to his home and the funds in the accounts were used for his and Minnie Stanley's living expenses.  Decedent died on August 24, 2003, leaving the accounts in appellant's and appellees' names.

At the time, the accounts totaled about $120,000.00 in deposits.  Shortly after the death of Decedent, appellees closed the five accounts and deposited the funds from them in a separate bank account created in their names, at Peninsula Bank.

Appellant learned about the withdrawal.  Claiming ownership of a one-fourth share of the funds that had been in the

five closed accounts, appellant asked Peninsula Bank to put a "hold" on that portion of the funds in the new account.

Peninsula Bank complied, placing a hold on the new checking account in an amount equal to one-quarter of the proceeds of the closed accounts plus any applicable interest that would have accrued had those accounts not been closed. Peninsula Bank brought an action for interpleader in the Circuit Court for Wicomico County. Eventually, in connection with the interpleader complaint, Peninsula Bank deposited $29,903.50 in the court registry.

On January 27, 2005, the court signed an order by consent for interpleader. The order discharged Peninsula Bank from liability and awarded the bank $865.00 in costs and attorney's fees; enjoined appellees from taking action against Peninsula Bank; re-designated appellant as the plaintiff and appellees as defendants in the action; and directed appellant to file a complaint stating his claim to the interpleaded funds. After the deductions taken by Peninsula Bank as allowed by the consent order, $29,038.05 plus accrued interest remains in dispute.

Thereafter, appellant, joined by his brother, Gary Stanley, filed a six-count complaint. Appellant was the sole plaintiff in the first three counts. Counts one and two alleged conversion and unjust enrichment, and count three sought a declaratory judgment that appellant is entitled to the funds at issue. Both appellant and Gary Stanley were plaintiffs in counts four through six, all of which alleged entitlement to certain tangible personal property unrelated to the funds at issue.

Appellees filed an answer and motion to dismiss the complaint. While the motion to dismiss was pending, appellant filed a motion for summary judgment, asserting that he is entitled to a judgment declaring his entitlement to the disputed funds, as a matter of law. During the pendency of that motion, the court held a hearing on the motion to dismiss. The court dismissed, without prejudice, all counts but count three, the declaratory judgment action brought by appellant. The court's dismissal of the remaining counts eliminated ap-

pellant's brother, Gary Stanley, from the suit. Gary Stanley has not challenged that ruling, so we shall make no further mention of him in this opinion.

Appellant supplemented the motion for summary judgment with the account signature cards and disclosure statements from Peninsula Bank that concern the accounts at issue in the case. He also filed two affidavits in support of the motion for summary judgment. One affidavit was appellant's and the other, his wife's. Appellant stated in his affidavit that Decedent had told him that he was made a joint owner of the bank accounts so that he would have "something" upon Decedent's death. Appellant's wife stated in her affidavit that she and appellant lived across the street from Decedent and appellee Minnie Stanley and cared for them during the years before Decedent's death. Appellant's wife stated further that Decedent had said, on more than one occasion, "Aren't you going to bring us some food? After all, you're going to get my money." She understood Decedent to be referring to the joint bank accounts at issue here.

Appellees filed a cross-motion for summary judgment on the remaining declaratory judgment count. They supported the motion with affidavits of appellees Leslie Armstrong and Laura Bradley, appellee Minnie Stanley's two children. The affidavit of Laura Bradley stated that all monies were to go to Minnie Stanley by the terms of Decedent's will. Ms. Bradley also stated that Decedent added the names of appellant, herself, and her brother so that any one of them could take care of Decedent's and Minnie Stanley's financial responsibilities, should it become necessary.

Appellees further supported the cross-motion for summary judgment with a certified copy of Decedent's Last Will and Testament (the "Will"). The Will was executed on September 17, 2002, after the title changes on the accounts took place. The Will stated: "I give and bequeath any ... bank accounts ... that I might have unto the said Minnie L. Stanley."

### The Summary Judgment Hearing

The summary judgment motions came on for a hearing. The parties agreed at the hearing that there existed no dispute of material fact and that the dispute centered on the proper construction of FI § 1–204. Appellant argued that FI § 1–204(d) controlled the outcome of the case, and appellees insisted that subsection (f) dictated the answer to the parties' dispute. Those subsections of FI § 1–204 provide:

(d) *Death of party.*—(1) Upon the death of a party to a multiple-party account, the right to any funds in the account shall be determined in accordance with the express terms of the account agreement.[1]

(2) If the account agreement does not expressly establish the right to funds in the account upon the death of a party, or if there is no account agreement, any funds in the account upon the death of a party shall belong to the surviving party or parties.

\* \* \*

(f) *Withdrawals.*—Unless the account agreement expressly provides otherwise, the funds in a multiple-party account may be withdrawn by any party or by a convenience person for any party or parties, whether or not any other party to the account is incapacitated or deceased.

Appellant argued that the plain language of FI § 1–204(d) and its legislative history support the notion that any funds remaining in a multiple-party account following the death of one of the parties belong to the surviving party or parties. Appellees countered that subsection (d) gives way to subsection (f) because the latter permits any party to a multiple-party account to withdraw funds.

Appellant acknowledged that withdrawal is "one of the incidents of ownership of [an] account." He argued, however,

---

1. "Account agreement" means "a written agreement, whether in 1 or more instruments, that establishes the type of account, the terms of account, and the relationship between the depository institution and the party or parties to the account." FI § 1–204(b)(3).

that the right of withdrawal "is not a superior right to the ownership right."

The parties and the court discussed whether appellant would be entitled to a constructive trust in the amount of the funds at issue. That matter arose because appellant had discussed *Haller v. White,* 228 Md. 505, 180 A.2d 689 (1962), in a memorandum replying to appellees' cross-motion for summary judgment and in further support of his own motion for summary judgment. In *Haller,* the Court of Appeals stated that a chancellor could properly impose a constructive trust to effectuate the entitlement of one of two joint owners of a bank account to her pro-rata share of the value of that bank account, notwithstanding that the other party to the bank account had the right to withdraw the funds in that account. *Id.* at 511, 180 A.2d 689.

Relying on *Haller,* appellant argued at the motions hearing that he has a right to enforce his entitlement to a one-fourth share of the funds that were in the five bank accounts on the date Decedent died, "by right of contribution, by a constructive trust, or by a declaratory judgment, such as is pending here ..." In response, appellees argued, among other things, that appellant was not entitled to summary judgment under a theory of constructive trust because the facts alleged in appellees' affidavits showed that he was not entitled to a constructive trust.

The court held the matter *sub curia* and later filed a written Opinion and Order. Although the court in its opinion recognized appellant's reliance on FI § 1–204(d), it did not address that subsection of the statute in its analysis. Instead, the court noted that FI § 1–204(f) permits any party to an account to withdraw funds from it. On that basis, the court stated that the only remaining issue to be decided was "whether the Court may exercise the equitable remedy of [imposing] a constructive trust" in favor of appellant. The court reasoned that, even assuming a constructive trust could be imposed in an action for declaratory judgment, the court could not impose one in this case because a constructive trust is appropriate

only when fraud or misrepresentation is involved, and appellant had failed to make such a showing.[2]

The court's order is set forth at the end of its opinion and reads:

> Having reviewed the pleadings and motions for summary judgment, as well as all attachments thereto, and finding no genuine dispute of any material fact, and further finding that Defendants are entitled to judgment as a matter of law, the Court GRANTS Defendants' motion for summary judgment and DENIES Plaintiff's motion for summary judgment, and it is
>
> ORDERED that Minnie L. Stanley, Leslie H. Armstrong and Laura D. Bradley are the joint owners of the $29,038.05 remaining in the Court Registry reflecting a reduction of $865.00 from the fund[s] for Peninsula Bank's attorney's fees and costs as previously ordered.

This appeal followed.

## II. THE PARTIES' CONTENTIONS

Appellant argues that he is entitled to summary judgment for a quarter share of the joint accounts, consistent with his survivorship interest under FI § 1–204(d), and that the court erred by not deciding the legal question in his favor. Employing the same reasoning, appellant argues that appellees' cross-motion for summary judgment should not have been granted. He adds that appellees' cross-motion for summary judgment relied in part on facts that are in dispute, namely, the donative intent of Decedent. Appellant also contends that the court erred by granting appellees' request for dismissal of count one (conversion) and count two (unjust enrichment), thereby erro-

---

2. As we shall see, we need not decide whether the court correctly ruled that appellant was not entitled to a constructive trust. We nevertheless note the "well-settled" proposition "that a constructive trust will be imposed to avoid unjust enrichment arising out of mistake in the absence of fraud, the violation of any fiduciary duty or any other wrongdoing." *Bailiff v. Woolman,* 169 Md.App. 646, 654, 906 A.2d 409, *cert. denied,* 396 Md. 12, 912 A.2d 648 (2006).

neously limiting his relief to declaratory judgment. Finally, appellant challenges the court's determination that he is not entitled to imposition of a constructive trust as a form of relief in this case.

Appellees counter that summary judgment was properly granted in their favor because they acted according to FI § 1–204(f), which entitled them to withdraw funds from the accounts.[3] Appellees state:

> [We agree] that upon the death of a party to a Multiple-party joint account the funds belong to the surviving parties, but, subject only to the possibility of the imposition of a constructive trust in an appropriate case . . ., the partys' [sic] rights to the funds are subject to the withdrawal rights provided for under subsection (f) or in the account agreement.

Appellees further respond that the court did not err in dismissing counts one and two of the complaint, because complaints arising out of interpleader actions are not the proper vehicle to claim compensatory and punitive damages. Finally, appellees argue that appellant is not entitled to a constructive trust because he did not seek that form of relief in the complaint.

For reasons that shall become evident, we need only address appellant's primary contention involving the construction of FI § 1–204. As we shall see, resolution of that issue dictates the proper outcome of the case.

### III. DISCUSSION

Appellant challenges the court's grant of appellees' cross-motion for summary judgment on the declaratory judgment count. He argues that the court's ruling rests on an incorrect construction of FI § 1–204. Appellant insists that, under the

---

**3.** Appellees also cite Maryland Code (1975, 2002 Repl. Vol.), § 3–110(d) of the Commercial Law Article, which addresses the identification of the person to whom a negotiable instrument is payable. That section is of no relevance to the claims we decide in this appeal.

proper construction of that section, he, not appellees, is entitled to summary judgment.

Our review of a grant of summary judgment is *de novo*. *See United Servs. Auto. Ass'n v. Riley*, 393 Md. 55, 67, 899 A.2d 819 (2006). "When reviewing the grant or denial of a motion for summary judgment we must determine whether a material factual issue exists, and all inferences are resolved against the moving party." *Id.* at 66, 899 A.2d 819. We must "examine[ ] the same information from the record and determine[ ] the same issues of law as the trial court." *Id.* at 67, 899 A.2d 819. Only when there is no dispute of material fact "will we proceed to determine whether the moving party is entitled to judgment as a matter of law." *Hill v. Knapp*, 396 Md. 700, 711, 914 A.2d 1193 (2007).

We begin our analysis by noting the parties' agreement that, insofar as this aspect of the case is concerned, there is no dispute of material fact.[4] The parties agree, in particular, that the five accounts at issue are multiple-party accounts subject to the provisions of FI § 1–204. *See* FI § 1–204(b)(2)(i) (defining "account"); (b)(7) (defining "joint account"), and (b)(8)(i) (defining "multiple-party account").[5] The parties also agree that all four of them were named, together with Dece-

---

**4.** The parties have a factual disagreement, for example, concerning Decedent's intent when he named the parties as joint tenants on the five bank accounts. That factual dispute would be relevant to the question of appellant's claim of unjust enrichment, which he argues the court wrongly dismissed, and to his claimed entitlement to a constructive trust. Because we resolve this case by directing the circuit court to enter summary judgment in favor of appellant on the ground that he is entitled to the funds in dispute by operation of FI § 1–204(d), the remaining issues do not require resolution.

**5.** FI § 1–204(b)(2)(i) provides: " 'Account' means any type of deposit or share account at a depository institution." FI § 1–204(b)(7) provides: " 'Joint account' means any account other than a P.O.D. account or a trust account established in the name of 2 or more parties." FI § 1–204(b)(8)(i) provides: " 'Multiple-party account' means any of the following types of accounts at a depository institution: 1. Joint account; 2. P.O.D. account; or 3. Trust account." A "P.O.D. account" is defined in FI § 1–204(b)(10). The parties do not argue that any of the accounts at issue is a P.O.D. account.

dent, as "parties" on all five accounts. *See* FI § 1–204(b)(9).[6] And the parties agree (at least insofar as this statutory construction argument is concerned) that FI § 1–204 dictates ownership of the roughly $29,000.00 in dispute.

We agree with appellant that the court's summary judgment ruling in favor of appellees is correct only if the court's construction of FI § 1–204 is correct, as a matter of law. For the reasons that we shall explain, we conclude that the court incorrectly construed FI § 1–204.

Subsections (d) and (f) of FI § 1–204 are of particular relevance to this case. For convenience, we restate those subsections, in pertinent part: [7]

(d) *Death of a party.*—(1) Upon the death of a party to a multiple-party account, the right to any funds in the account shall be determined in accordance with the express terms of the account agreement.

(2) If the account agreement does not expressly establish the right to funds in the account upon the death of a party, or if there is no account agreement, any funds in the account upon the death of a party shall belong to the surviving party or parties.

\* \* \*

(f) *Withdrawals.*—Unless the account agreement expressly provides otherwise, the funds in a multiple-party account may be withdrawn by any party or by a convenience person for any party or parties, whether or not any other party to the account is incapacitated or deceased.

Appellant states, without disagreement from appellees, that the "account agreement[s]" referred to in subsection (d) consist in this case of a document entitled "Rules and Regulations Governing Your Deposit Account," and the account signature cards. The circuit court had noted that "[n]one of the docu-

---

**6.** FI § 1–204(b)(9)(i) provides: " 'Party' means any person who, by the terms of the account agreement, possesses a present right to draw upon funds in a multiple-party account."

**7.** Because of its length, we do not set forth the entirety of FI § 1–204.

ments indicates what the rights of the respective parties are." Appellant takes issue with the court's statement. He points out that the documents provide for survivorship rights upon the death of one party to the account. He argues that the documents thereby establish by their express terms his entitlement, as a surviving party to the accounts, to a one-fourth share of the monies that were in the five accounts, under FI § 1–204(d)(1). Appellant argues in the alternative that, even if the account agreements do not expressly declare his ownership of a proportionate share of the funds in the accounts, his ownership interest is dictated by (d)(2).

The "Rules and Regulations Governing Your Deposit Account" reads in pertinent part:

> MULTIPLE–PARTY ACCOUNTS. If this account is held by two or more persons. . . . Each of you is liable for any charge to the account and any one of you may close the account even if two or more signatures are required to withdraw funds from the account. Unless expressly provided otherwise on the signature card relating to your account, *upon the death of any of you, the funds in the account will belong to any surviving depositors on your account.*

(Emphasis added.) The signature cards for the accounts bear the names, signatures, and social security numbers of all of the account holders, but none of the signature cards expressly provides for the ownership of the account funds upon the death of any one of them.[8]

Interpretation of contract agreements, in this case, the account agreements, is a matter of law that we review *de novo*. *See Riley*, 393 Md. at 79, 899 A.2d 819. "Courts in Maryland follow the law of objective interpretation of contracts, 'giving effect to the clear terms of the contract regardless of what the parties to the contract may have believed

---

8. None of the signature cards states that the account is a joint account with right of survivorship; the account agreements related to the two CDs, however, indicate on their face that the accounts are "Joint—With Survivorship." Regardless, as we have said, the parties agree that the accounts are multiple-party accounts governed by FI § 1–204.

those terms to mean.'" *Id.* at 79, 899 A.2d 819 (quoting *Towson Univ. v. Conte,* 384 Md. 68, 78, 862 A.2d 941 (2004)).

The Rules and Regulations plainly provide that, upon the death of one of the parties to a multiple-party account, the funds in the account belong to the surviving depositors. The Rules and Regulations also provide that any party may close the account even if two or more signatures are required to withdraw funds. The account agreements do not specifically address, much less resolve, the precise issue raised by this case: whether closure of the account by one of the surviving parties extinguishes the other party or parties' legal title to the funds in the account. Indeed, the Account agreements no more expressly provide the answer to that question than does FI § 1–204, itself.[9]

The question remains whether subsection (f) of FI § 1–204, which addresses each party's right to withdraw funds from a multiple-party account, trumps the survivorship rights of the parties recognized by subsection (d). We therefore shall focus our attention upon the statute itself.

The rules of statutory construction are well established and have been often restated. The Court of Appeals has recently recounted them:

> [O]ur goal is to identify and effectuate the legislative intent underlying the statute. To ascertain the Legislature's intent, we first examine the plain language of the statute; if the language is unambiguous when construed according to its ordinary meaning, then we will "give effect to the statute as it is written." If a statute's language has more than one reasonable interpretation, however, the language is ambiguous, and we will resolve any ambiguity in light of the legislative history, caselaw, and statutory purpose. We will

---

9. That the Rules and Regulations essentially restate the language of subsection (d) is not surprising, given the requirement of FI § 1–204(e) that multiple-party accounts opened on or after October 1, 1993, must contain a clear statement "specifying that unless contrary direction is given in the account agreement, upon the death of a party, the funds in the multiple-party account shall belong to the surviving party or parties."

examine the ordinary meaning of the language, as well as "how that language relates to the overall meaning, setting, and purpose of the act," resolved to avoid any unreasonable, illogical, or inconsistent interpretation of the statute. Finally, we presume that the Legislature has acted with full knowledge of prior legislation, and construe the statute as a whole so that no word, clause, sentence, or phrase is rendered surplusage, superfluous, meaningless, or nugatory. *Dep't of Health and Mental Hygiene v. Kelly,* 397 Md. 399, 419–20, 918 A.2d 470 (2007) (citations omitted).

Subsections (d) and (f) address separate features of a multiple-party account: ownership and right of withdrawal. Reading subsection (f) as appellees do would seem, at least in the situation presented by this case, to render subsection (d) meaningless, if not directly inconsistent with subsection (f). Such a reading therefore would run afoul of the rules of statutory construction that require us to read the statute, if at all possible, so that all parts of it are in harmony, and "no word, clause, sentence, or phrase is rendered surplusage, superfluous, meaningless, or nugatory." *Kelly,* 397 Md. at 420, 918 A.2d 470. In the case of FI § 1–204, the most reasonable construction that gives meaning to every provision is the one offered by appellant: subsection (f) allows any owner of the multiple-party account to withdraw funds from it, but that right of withdrawal does not supersede subsection (d), which grants survivorship rights (and thus ownership rights) to all of the parties to the account who survive the death of one of them.

Even if we assume that FI § 1–204 is ambiguous, ambiguity in a statute can be resolved by resort to its legislative history.[10] To understand the legislative history of FI § 1–204, it is necessary first to understand the state of the common law in Maryland concerning disposition of multiple-party bank ac-

10. Even when the language of a statute is plain, we can confirm our construction of it by examining its legislative history. *See Mayor and City Council of Baltimore v. Chase,* 360 Md. 121, 131, 756 A.2d 987 (2000).

counts before 1992, when the statute was enacted. The common law was driven in large part by two nineteenth century decisions: *Whalen v. Milholland,* 89 Md. 199, 43 A. 45 (1899) (*Milholland I*) and *Milholland v. Whalen,* 89 Md. 212, 43 A. 43 (1899) (*Milholland II*). In *Milholland I,* the Court considered a savings account that was titled as "Elizabeth O'Neill and Mary Whalen. Joint owners. Payable to the order of either or the survivor." 89 Md. at 200, 43 A. 45. Elizabeth O'Neill had opened and funded the account, and she maintained possession of the account "pass-book," which was needed to withdraw money from the account during her lifetime. *Id.* When O'Neill died, both Whalen and the executor of O'Neill's estate claimed the money in the account. *Id.* at 200–01, 43 A. 45.

The Court of Appeals stated that, for Whalen to prevail, she needed to prove that she was the recipient of a valid gift from O'Neill. *Id.* at 201, 43 A. 45. The Court made clear that the words "joint owners" on the titling document did not establish a gift, because O'Neill had retained dominion and control over the money by virtue of her power of withdrawal. *Id.* at 202–03, 43 A. 45. The Court held that, because Whalen was unable to prove a valid and effective gift, the money belonged to the estate. *Id.* at 211, 43 A. 45.

*Milholland II* involved a different savings account that Mary Whalen owned with O'Neill. 89 Md. at 212, 43 A. 43. The account pass-book contained an entry that stated: "Metropolitan Savings Bank, in account with Miss Elizabeth O'Neill. In trust for herself and Mrs. Mary Whalen, widow, joint owners, subject to the order of either; the balance at the death of either to belong to the survivor." *Id.* at 213, 43 A. 43. The Court concluded that Ms. Whalen, rather than the estate, was entitled to the money as the beneficiary of the trust, without the necessity of showing a gift. *Id.* at 219, 43 A. 43.

In the wake of the two *Milholland* decisions, cases involving ownership of jointly held bank accounts concentrated on the donor's intent in creating the account. "In order for a donee-beneficiary to inherit [the assets in a joint account,]

there must be a perfected *inter vivos* gift by the donor-decedent." *Barker v. Aiello*, 84 Md.App. 629, 634, 581 A.2d 462 (1990).[11] Moreover, the common law presumption of joint ownership with the right of survivorship, created by the titling of a bank account as joint, can be overcome by evidence that the owner's intent was not to create such rights in the title-holder. *Haller v. White*, 228 Md. 505, 510, 180 A.2d 689 (1962).

*Milholland I* and *II*, and the cases that followed, precipitated some uncertainty concerning ownership of multiple-party bank accounts following the death of the account holder. To resolve that uncertainty, the General Assembly enacted the Multiple Party Accounts Statute, codified at FI § 1–204, by chapter 578 of the 1992 Laws of Maryland (the Act). The Act "changed substantially the law on the disposition of multiple party bank accounts[,]" " 'releas[ing] courts from the gift and trust tests for determining where funds should go.' " *Hartlove v. Md. Sch. for the Blind*, 111 Md.App. 310, 343 n. 16, 681 A.2d 584 (1996) (quoting Hon. Albert W. Northrop & Robert A. Schmuhl, Decedents' Estates in Maryland, § 7–20(e) at 336 (1994)), *vacated on other grounds*, 344 Md. 720, 690 A.2d 526 (1997).

The uncodified section of the Act declares its purpose:

[T]his Act is intended to alter the common law, including *Whalen v. Milholland*, 89 Md. 199, 43 A. 45 (1899), *Milholland v. Whalen*, 89 Md. 212, 43 A. 43 (1899) and their progeny, as it applies to all deposit accounts in financial institutions that are established in the name of one or more

---

**11.** In *Rogers v. Rogers*, 271 Md. 603, 607, 319 A.2d 119 (1974), the Court of Appeals stated:

The requirements for a valid *inter vivos* gift are an intention on the part of the donor to transfer the property, a delivery by the donor and an acceptance by the donee. Moreover, the delivery must transfer the donor's dominion over the property. There cannot be reserved to the donor a *locus poenitentiae*, which is a power to revoke the gift or a dominion over the subject of the gift.

parties, whether or not in trust, or with survivorship rights, or with payable on death rights.

Ch. 578, sec. 2, Acts 1992.

The legislation, entitled "Financial Institutions—Multiple–Party Accounts," was introduced in 1991 as Senate Bill 756 and, after referral for interim study, was reintroduced the next year as House Bill 956. The bill was the product of three years of joint study by the Section Council of the Section of Estate and Trust Law of the Maryland State Bar Association, and the Maryland Bankers Association. *See* Testimony of Jeffrey Radowich, Chair Elect, Section Council of the Section of Estate and Trust Law of the Maryland State Bar Association in support of SB 756 ("Radowich Testimony"). According to the Maryland-Bankers Association, the purpose of the bill was to "establish[ ] a statutory framework for the creation of 'multiple-party' deposit accounts and for the determination of the rights of persons who claim to have an interest in multiple-party deposit accounts." The problem was articulated as follows:

A person thinks he or she has established an account at a financial institution which will pass on that person's death to another surviving person, but after death it turns out that the form of the account does not bring about that result. Instead, the property gets paid to the probate estate, and often ends up in the hands of an entirely different person.

*See* SB 756 Bill File, "Radowich Testimony."

The problem was exacerbated by the fact that "[d]ifferent financial institutions use various forms of language to describe the different kinds of multiple party deposit accounts, compounding the confusion." *Id.* Furthermore, "[c]urrent Maryland statutes have different provisions regarding certain types of multiple party deposit accounts for savings and loan associations, on the one hand, and banking institutions, on the other hand." *Id.*

The Bankers Association noted that, under the bill, "[i]f the account agreement is silent as to the rights of the[ ] various individuals, then House Bill No. 956 provides certain rules: (1)

an account party will have a right to funds in the account (*i.e.,* will have survivorship rights) upon the death of another account party ...." Survivorship rights were emphasized again in the House Economic Matters Committee's Bill Analysis of HB 956, which stated:

### RIGHTS OF PARTIES

*Death of a Party*

The bill sets out the rights of parties in multi-party accounts. The *basic rule* is that, upon the death of a party to a multiple-party account, the *right to any funds in the account is determined under the express terms of the account agreement.*

If the account agreement *does not* expressly establish the right to funds in the account upon the death of a party, or if there is no account agreement, *any funds in the account* upon the death of a party *belongs [sic] to the surviving party or parties.*

With but a few minor amendments not relevant here, the law was passed as originally proposed. We conclude from the lack of substantive change to the original bill that the legislature's purpose is largely, if not entirely, reflected in the legislative history contained in the bill file. The history of the Act and its declared purpose make plain that the overriding intent of the legislature was to abrogate the common law rules concerning donative intent established by *Milholland I* and *II*, and to provide unequivocally that, in the absence of an account agreement that states otherwise, upon the death of one of the parties to a multiple-party account the survivors own the funds in the account.

By no stretch does the legislative history support the view of appellees, that the right of the parties to the account to withdraw funds from it supersedes the survivorship rights spelled out in subsection (d) of the statute. Indeed, the construction proposed by the appellees would encourage the undesirable practice of one party's racing post-mortem to claim funds in an account before other parties are given an

opportunity to collect their share. Nothing in FI § 1–204 suggests such an absurd result.

■ Rather, the legislative history and the declared purpose of the Act resolve any possible ambiguity concerning how FI § 1–204(d) and (f) should be construed. Although any party to a multiple-party account may withdraw funds under FI § 1–204(f), that right of withdrawal does not create an ownership interest in the funds withdrawn that overrides the ownership interest of the remaining survivors to the account, established by FI § 1–204(d). Furthermore, the rebuttable presumption of a gift that was available at common law has been abrogated by the statute. Consequently, it is no longer relevant to the issue of survivorship whether the donor intended to create the right of survivorship in the title-holder.

■ The construction that we have given FI § 1–204 leads ineluctably to the conclusion that the court erred as a matter of law by declaring the disputed funds to be owned by appellees, to the exclusion of appellant. Rather, by operation of FI § 1–204(d), appellant became a co-owner, together with appellees, of the funds in the five accounts upon the death of Decedent. That ownership interest could not be impaired by appellees' withdrawal of the funds from the accounts, regardless of their entitlement to make the withdrawal. It follows, too, that appellant was not obligated, as the circuit court believed, to establish wrongdoing on the part of the appellees when they withdrew the funds in order to demonstrate his entitlement to a share of those funds.

We therefore hold that the circuit court made a legal error by granting summary judgment in favor of appellees and declaring them to be the owners of the funds in dispute. Rather, as one of the four surviving parties to the five accounts, appellant is entitled to the funds in dispute. Those funds represent a one-fourth share of the total amount of the funds remaining in the accounts on the death of Decedent, who was the sole source of those funds. Appellant was not required to show his entitlement to a constructive trust in this case because the funds in dispute were already in *custodia*

*legis* by virtue of the interpleader order.[12]    Furthermore, given the statute, it does not matter what the donative intent of Decedent might have been when he added the names of appellant and appellees to the accounts.

█    The court's legal error must be corrected by reversing its grant of appellees' cross-motion for summary judgment. What remains to be decided is whether appellant is entitled to further relief at this juncture.   Ordinarily, the appellate courts do not direct the circuit court to grant summary judgment in favor of a party.   From time to time, however, the Court of Appeals has done precisely that, when the circuit court had no recourse, under the law, but to grant summary judgment in favor of one party over the other.   *See, e.g., Prop. and Cas. Ins. Guar. Corp. v. Yanni,* 397 Md. 474, 500, 919 A.2d 1 (2007) (reversing the circuit court's grant of summary judgment to Yanni, an injured worker, as the result of that court's erroneous construction of section 9–727 of the Workers' Compensation Act, and remanding to the circuit court for entry of summary judgment in favor of the Property and Casualty Insurance Guarantee Corporation); *Salamon v. Progressive Classic Ins. Co.,* 379 Md. 301, 317, 841 A.2d 858 (2004) (reversing the circuit court's grant of summary judgment in favor of the insurer, as a result of that court's failure to find a commercial use exclusion of liability coverage invalid based on Maryland's compulsory insurance law, and remanding to the circuit court for entry of summary judgment in favor of the insured); *Cole v. State Farm Mut. Ins. Co.,* 359 Md. 298, 318–19, 753 A.2d 533 (2000) (reversing the circuit court's grant of summary judgment in favor of the insurer, as a result of that court's erroneous interpretation of an insurance policy, and remanding to the circuit court for entry of summary judgment in favor of the insured).

---

**12.** We do not mean to imply that appellant would not have been entitled to a constructive trust if the funds in dispute had not been placed in the court registry, but instead had been retained by appellees, either personally, or in a bank account in their names. *See supra, Haller v. White,* 228 Md. 505, 180 A.2d 689 (1962); *see also supra* note 2.

It is appropriate here not only to reverse summary judgment in favor of appellees, but also to remand the case to the circuit court with the direction to grant appellant's motion for summary judgment and declare him to be the owner of the funds in dispute, $29,038.05 plus accrued interest.

**JUDGMENT REVERSED. CASE REMANDED TO THE CIRCUIT COURT FOR WICOMICO COUNTY WITH DIRECTIONS TO THAT COURT TO GRANT APPELLANT'S MOTION FOR SUMMARY JUDGMENT.**

**COSTS TO BE PAID BY APPELLEES.**