REPORTED

IN THE COURT OF SPECIAL APPEALS
OF MARYLAND

No. 2299

September Term, 2013

_____

JACQUELINE WAGNER

v.

STATE OF MARYLAND

_____

Woodward,
Wright,
Berger,

JJ.

_____

Opinion by Wright, J.

_____

Filed:  October 30, 2014

Appellant, Jacqueline Wagner ("Wagner"), appeals her conviction in the Circuit Court for Baltimore County for theft and embezzlement for taking money from a joint bank account on which she was named a joint owner with her father. On February 14, 2013, Wagner was charged by information with theft of more than $500.00 and fraudulent misappropriation by a fiduciary. After a two-day bench trial on October 17 and 18, 2013, the trial court found Wagner guilty of both counts. At sentencing on October 21, 2013, the trial court sentenced Wagner to eight years with all but 18 months suspended for theft (with the misappropriation conviction merging into the theft count) and five years' unsupervised probation. After her motion for a new trial was denied on November 21, 2013, Wagner filed this appeal on December 11, 2013.

On appeal, Wagner asks: if a person is added to a bank account as a joint owner, without the intent that the person have an ownership interest, can that person be guilty of theft from that joint bank account?[1]

---

[1] Wagner presented two questions in her brief:

> 1.  Is it impossible, as a matter of law, for a person to be guilty of theft from a multiple-party bank account to which she is a party in the absence of any language in the account agreement restricting that party's use of funds?
>
> 2.  Can the misappropriation by a fiduciary conviction stand where the State never proved and [judge] did not find that Wagner was not a fiduciary?

Because we agree with the trial court that Wagner is guilty of theft of over $500.00 for the reasons explained below, and because the misappropriation merged into the theft count, we need not address Wagner's second question.

## Facts

Marion Wagner (the "victim") was 84 years old at the time of trial. He had three daughters, Karen, Jacqueline, and Kathleen. The victim worked for Colonial Pipeline for 33 years until his retirement in 1994. For most of his life, he lived in a row house on South Curley Street with his wife, Jean, who died in 2005. While Jean was alive, she handled the family finances. After Jean passed away, the victim attempted to handle his finances himself. Eventually, he asked one of his three daughters, Jacqueline Wagner, to assist him. At the time, the victim's assets included $200,000.00 in an IRA account with American Century (the "IRA") and a checking and savings account with Provident Bank[2] (the "Account"). The victim received a monthly pension check of $88.00, and he also received Social Security.

On July 29, 2005, the victim added Wagner as a joint owner to the Account.[3] The victim testified that he did so in case he was unable to get the money himself:

> STATE: Okay. Now in 2005, you indicated that you put [Wagner] on your account. Why did that happen?
>
> [VICTIM]: That happened because I had my bank account with my wife's name on it, but since she passed away, I wanted somebody else to be able to get the money if I couldn't get it myself. So I asked my daughter if I could put her name on the account and this is my money in there, but not hers, and she agreed to do that.
>
> STATE: What specific instructions did you give her about

---

[2] In May 2009, M&T Bank acquired Provident Bank. As a result, Provident Bank no longer exists, and the Account was transferred to M&T Bank.

[3] The parties were familiar with joint bank accounts. In 2002, Wagner added the victim as a joint owner to two of her own bank accounts.

putting your, her name on your account?

    [VICTIM]:    The only reason I did that was in order for me to get my money out if I couldn't get it, would she be able to get it for me.

    STATE:    Okay.

    [VICTIM]:    That was my money.

Wagner agreed and testified that "I was put on his account in case anything happened to him[.]" The victim retained the checkbook for the Account, but Wagner had an ATM card to access the funds.[4]

In 2006, the victim mortgaged his home for $87,000.00 to help Wagner's business of transporting people to and from Bingo parlors and Delaware Park casino.[5] The victim testified that the mortgage proceeds were a loan to Wagner, and he believed that Wagner would make the mortgage payments to repay the loan.

In January 2007, the victim moved from his home on Curley Street in Baltimore City to Wagner's home in Baltimore County after his home was damaged by fire.[6] The victim's house was in Canton, where houses were selling for up to $400,000.00. The

---

[4] When asked about the ATM card, the victim stated that he "never knew [he] had one."

[5] The victim would occasionally drive for the business, although he was never compensated for his time. Additionally, the victim frequently patronized Wagner's business so that he could play Bingo or gamble at Delaware Park, and he would have Wagner withdraw money for that purpose. He testified that he asked her to withdraw hundreds, rather than thousands, of dollars.

[6] After the fire, the victim received $40,000.00 in insurance proceeds to repair the damage. It is not clear from the record whether the proceeds were deposited into the Account.

plan was to repair the house and rent it out after the repairs were completed.  He lived with Wagner until late 2009 without paying rent or household bills.

Before the victim left Wagner's home, he received a statement from his bank informing him that his mortgage on the Curley Street house had not been paid and threatening foreclosure.  The victim called the bank to inquire about the notice and was informed that Wagner had not paid the mortgage and that $60,000.00 was owed to the bank.  When he asked about how much money he had in the Account, the victim "was astonished to find out that it was nothing."

The victim left Wagner's house and went to live with one of his other daughters, Kathy.  Over the next several months, he began collecting copies of his bank records to find out what happened to the money in the Account.  In 2010, the victim went to the district court commissioner's office and filed a complaint against Wagner.[7]

After he filed his complaint, the victim met with Detective Chenoweth of the Baltimore County Police Department fraud unit.  From what we can ascertain from the record, Det. Chenoweth's investigation revealed that between May 8, 2006 and September 30, 2009, the Account contained money from the mortgage, withdrawals from the IRA, Social Security checks, and other sources.[8]  And, during that same time,

---

[7] The victim alleged in the complaint that Wagner stole the $87,650.00 from him, which was proceeds of the mortgage.

[8] From the record, it appears that a visual exhibit was used to show how much money was funneled into and out of the Account.  It is not clear from the testimony where the all of the funds originated.  It is clear that some of the money came from these sources (and perhaps others), went into the Account, and then was transferred out ─ but, much like the confusion related to the sources of the funds, it is not clear how much

4

$181,670.09 was withdrawn from the IRA, and $251,645.83 in total was taken from the

Account. The victim testified at trial that taken from the Account, without his

permission, was approximately:

1. $12,000.00 in cash withdrawals;
2. $42,000.00 in wire transfers to Wagner's personal account (which she jointly owned with the victim);
3. $99,000.00 in ATM withdrawals;
4. a $12,000.00 wire transfer to KLMJ Inc.;[9] and
5. a $4,000.00 wire transfer to Smythe Transportation.[10]

Wagner testified that she never took money from the IRA without her father's

authorization and denied signing his name on the requests for withdrawals from his IRA.

Wagner denied taking anything from the Account for her own benefit ─ she stated the

withdrawals were at her father's direction when he needed money to go gambling.

Wagner testified that the $87,000.00 from the mortgage on her father's house was a gift,

and that she paid the mortgage when she had the money do so. She acknowledged that

the general contractor for the work on her father's house did not get paid.

After a two-day trial, the court found that from May 8, 2006 to September 30,

money from each source went into the Account nor whether the transfers out were tied to a particular incoming source. What we can determine is that $181,670.09 was withdrawn from the IRA and a flow chart was used to show money taken from the Account by Wagner during this time.

[9] According to the testimony of a representative of M&T Bank, the signature card of KLMJ, Inc. shows that Wagner is the owner of KLMJ, Inc.

[10] According to the testimony of a representative of M&T Bank, the signature card of Smythe Transportation shows Wagner as an authorized signer of the account.

2009, Wagner took $122,355.00 from the Account.[11]  The trial judge stated that she had

> absolutely no question in [her] mind, none, that [Wagner] took and used the money in [the Account] for her own purposes.  I am truly well beyond having a reasonable doubt.  I have no doubt.  I reject factually as strongly as I can that [Wagner] withdrew funds at [the victim's] request[.]

After reaching its factual findings, the trial court indicated that it believed the case presented a legal issue.  As the trial judge noted, "I really think factually there's no question about what happened.  I think it's much more of a legal question. . . . I have, frankly, spent the majority of my time, trying to figure out what is, what are the consequences or ramifications of a joint account."

In reaching her legal findings, the trial judge noted that she reviewed *Milholland v. Whalen*, 89 Md. 212 (1899) ("*Milholland II*"), *superseded by statute*, Md. Code (1980, 2011 Repl. Vol.), § 1-204 of the Financial Institutions Article ("FI"); *Kornmann v. Safe Deposit & Trust Co. of Baltimore*, 180 Md. 270 (1942); *Haller v. White*, 228 Md. 505 (1962), *superseded by statute*, FI § 1-204; *Hamilton v. Caplan*, 69 Md. App. 566 (1987); *Stanley v. Stanley*, 175 Md. App. 246 (2007); and *Perhamsky v. Flinkman*, Civil No. WDQ-09-1756, slip op. (D. Md. July 1, 2010).[12]  According to the trial judge, the review

---

[11] The trial court arrived at this amount by looking at what money went directly from the Account into Wagner's checking account (which she co-owned with the victim), the Smythe Transportation account, and the KLMJ, Inc. account.  The trial court did not make any findings as to the disposition of the mortgage (as a gift or a loan) or the IRA withdrawals (as with or without the victim's authorization).

[12] Although the trial court reviewed *Perhamsky*, Civil No. WDQ-09-1756, slip op., during its decision-making process, "it is the policy of this Court in its opinions not to cite for persuasive value any unreported federal or state court opinion."  *Kendall v. Howard Cnty.*, 204 Md. App. 440, 445 n.1 (2012), *aff'd*, 431 Md. 590 (2013).  Accordingly, we did not consider *Perhamsky* in reaching our decision.

of these cases revealed:

> [T]here is, in fact, a rebuttable presumption [of joint ownership]. There's a difference in ownership and ability to withdraw and one starts with the presumption that in a case where there's joint ownership with a right of survivorship, which is created by the titling of the account, that it's joint owners. But it can be rebutted and the burden is on the person who wants to rebut it. . . . I'm reading from *Haller v. White*, it says we think the most significant fact is the form of the account, which on its face creates a joint tenancy. It is true that this raises only a rebuttable presumption but the burden is upon the party seeking to rebut it. In the *Stanley* case, the common law presumption of joint ownership with the right of survivorship created by the titling of the bank account as joint can be overcome by evidence that the owner's intent was not to create such rights in the titleholder. I have really struggled, I make no bones about it, over this issue of can you actually have a situation where there's theft when the titling is joint owners and I come down on the side that you can and that is because I am persuaded that even if one starts with this presumption that it's joint owners, it can be rebutted and I have found in this case, as I said, it's, it's really for me, I have to confess, it's not beyond a reasonable doubt, it is beyond all doubt.

The trial judge reiterated her findings at sentencing.

> I understand completely that this is titled a joint account and I understand that, pursuant to the Financial Institutions Article, that means either one may withdraw money. But I have also found that they each put the other on their accounts for the sole purpose of allowing the non-incapacitated person to get the funds in the event someone was incapacitated. . . . when I read the cases that I cited to you on Friday, including *Perhanski v. Flipman* [sic] and *Stanley v. Stanley* and your *Korman* [sic] case, I am understanding from those cases that there is a distinction between ownership and ability to withdraw and the agreement that these people had was an agreement that the money was only to be withdrawn by the other one, in this case, [Wagner] was only to withdraw [the victim's], which she repeatedly said was his money[.] . . . that's the agreement they made among themselves and, while I understand she could, pursuant to Financial Institutions, withdraw money from a joint account, the agreement that these people had was that she would only withdraw it for his benefit.

## Discussion

Wagner was convicted of theft based on her act of withdrawing funds from a joint account to which both she and the victim were parties and using those funds for her own benefit. Wagner does not dispute the fundamental factual findings made by the trial court: (1) that the victim added Wagner as a holder of his account for the sole purpose of allowing Wagner to access funds in his account for the victim's benefit, (2) that Wagner understood that the funds in the joint account belonged to the victim, and (3) that Wagner withdrew funds from the account on her own accord and used them for her own benefit.

Wagner instead argues that the above factual findings are irrelevant because, as a party to the joint account, she was an "owner" of the property, and thus could not be convicted of stealing her own property. Wagner's argument is based on FI § 1-204(f), which states as follows:

> Unless the account agreement expressly provides otherwise, the funds in a multiple-party account may be withdrawn by any party or by a convenience person for any party or parties, whether or not any other party to the account is incapacitated or deceased.

In essence, Wagner claims that because she, as a party to the account, was authorized under FI § 1-204(f) to withdraw funds from that account, she was also authorized to use these funds for her own use. Wagner's strained reading of FI § 1-204(f) fails.

As the trial court found, the language in FI §1-204(f) relates only to the relationship between the parties to an account as it affects the financial institution. In other words, FI § 1-204(f) governs only an account holder's ability to access funds from a joint account, and it does not relate to the underlying ownership interests in those funds.

8

Thus, by referencing only a party's withdrawal rights, and not any ownership interests, FI § 1-204(f) does not affect or supersede any relationship or agreement between the parties themselves relating to the ownership of the funds in an account.

## I.     The Statutes at Issue

Wagner's question requires us to examine two statutes and determine their meaning. Because this question demands that we review Maryland statutory law, "our Court must determine whether the trial court's conclusions are 'legally correct' under a *de novo* standard of review." *Schisler v. State*, 394 Md. 519, 535 (2006) (citations omitted). As to the trial judge's factual findings, we "will reverse only for clear factual error. A factual finding is clearly erroneous if there is no competent and material evidence in the record to support it." *Hoang v. Hewitt Ave. Ass'n, LLC*, 177 Md. App. 562, 576 (2007) (citations omitted).

"[T]he starting point in every case involving construction of a statute is the language itself." *Kaczorowski v. Mayor & City Council of Balt.*, 309 Md. 505, 514 (quoting *Watt v. Alaska*, 451 U.S. 259, 265 (1981)).

> In determining the meaning and scope of a legislative enactment, the Court considers the language thereof in its natural and ordinary connotation. If there by no obscurity or ambiguity on the face of it, there is no necessity for construction, and the language will be accorded its apparent meaning. Where, however, the words of a statute are of doubtful meaning, the Court, in determining legislative intent, will consider not only the usual and literal meaning of such words, but will also consider their meaning and effect in the light of the setting, the objectives and the purposes of the enactment.

*League v. State*, 1 Md. App. 681, 687 (1967) (citations omitted). We list each statute here as a precursor to our discussion.

9

### A.    *Maryland's Consolidated Theft Statute*

Md. Code (2002, 2012 Repl. Vol.), § 7-104 of the Criminal Law Article ("CL")

states:

**Unauthorized control over property**
(a) A person may not willfully or knowingly obtain or exert unauthorized control over property, if the person:

(1) intends to deprive the owner of the property;
(2) willfully or knowingly uses, conceals, or abandons the property in a manner that deprives the owner of the property; or
(3) uses, conceals, or abandons the property knowing the use, concealment, or abandonment probably will deprive the owner of the property.[13]

The definition of "owner," provided in CL § 7-101(h), is particularly pertinent to

our discussion:

**Owner**
(h) Except as otherwise expressly provided in this part, "owner" means a person, other than the offender:

(1) who has an interest in or possession of property regardless of whether the person's interest or possession is unlawful; and
(2) without whose consent the offender has no authority to exert control over the property.

### B.    *The Financial Institutions Article*

The parties also draw our attention to FI § 1-204, Transfer of account on death,

which states:

(a) A provision in an account agreement for a transfer on death in compliance with this section is nontestamentary and shall be effective according to the provisions of this section. Transfers pursuant to this

---

[13] We note that there is nothing in the legislative history for CL § 7-104 (or the statutes prior to the consolidation into the current theft statute) indicating that the legislature addressed the particular issue of taking money from a joint bank account.

section are effective in the form and manner prescribed by this section and are not to be considered testamentary.

. . .

(f) Unless the account agreement expressly provides otherwise, the funds in a multiple-party account may be withdrawn by any party or by a convenience person for any party or parties, whether or not any other party to the account is incapacitated or deceased.

Even though FI § 1-204's purpose is to govern the relationship between a financial institution and its depositors, there is no other statute that addresses "multiple-party" bank accounts.[14]

## II.     Statutory Analysis

The majority of the case law discussion on the question of ownership of joint bank accounts has been in the context contemplated by FI § 1-204: ownership upon death of one of the parties. We previously recognized in *Stanley*, 175 Md. App. at 265, that FI § 1-204 does govern the ownership interests of joint owners upon the death of a co-owner and abrogates all of the case law before it related to the issue, but we have not determined the applicability of FI § 1-204 to the rights of joint owners while all owners are still

---

[14] FI § 1-204(b)(2)(i) provides: "'Account' means any type of deposit or share account at a depository institution." FI § 1-294(b)(7) provides: "'Joint account' means any account other than a P.O.D. account or a trust account established in the name of 2 or more parties." FI § 1-204(b)(8)(i) provides: "'Multiple-party account' means any of the following types of accounts at a depository institution: 1. Joint account; 2. P.O.D. account; or 3. Trust account." A "P.O.D. account" is defined in FI § 1-204(b)(10). The parties do not argue that any of the accounts at issue is a P.O.D. account.

*Stanley*, 175 Md. App. at 256 n.5.

11

living, as is the case here.  Our charge here is to decide if Wagner owned the account

within the meaning of CL § 7-104.

**A.      *Ownership of a Bank Account***

Like the trial judge below, we start with the question of who was an actual owner

of the bank account.  Whether titling a bank account as "joint owners" creates equal

ownership in each of the joint owners is key to our findings.  In *Barker v. Aiello*, 84 Md.

App. 629, 634-37 (1990), we outlined relevant case law involving litigation to resolve

ownership rights of various parties upon the death of one of the parties to the account:

> Maryland distinguishes between joint bank accounts and joint trust
> accounts.  Joint bank accounts do not contain trust language, and the
> depositor retains legal and equitable title to the monies.  *Whalen v.
> Milholland,* 89 Md. 199, 43 A. 45 (1899) (*Milholland I*).  In order for a
> donee-beneficiary to inherit there must be a perfected *inter vivos* gift by the
> donor-decedent.  Otherwise, *locus penitentiae* remains in the owner who
> then retains control and dominion over the funds.  89 Md. at 201, 43 A. 45.
> In *Milholland I,* the passbook entry read: "Elizabeth O'Neill and Mary
> Whalen. Joint owners. Payable to the order of either or the survivor." The
> court held that Mrs. O'Neill did not make a valid and effective gift to Mrs.
> Whalen, despite the wording "joint owners," because Mrs. O'Neill retained
> the passbook and there was no effective delivery. The balance in the
> account was held an asset of the estate. *Milholland I,* 89 Md. at 202, 43 A.
> 45.
>
> A trust account does not necessarily contain trust language, either.  *Pearre
> v. Grossnickle,* 139 Md. 274, 279, 115 A. 49 (1921).  The donor's act
> creates the trust, but it is the donor's "intention with which he does the act
> that is material."  *Milholland v. Whalen,* 89 Md. 212, 216, 43 A. 43 (1899)
> (*Milholland II*).  The general rule regarding trust accounts in Maryland,
> stemming from *Milholland II* and its progeny, is that a revocable trust
> account is presumed to exist where there is an unexplained passbook entry
> containing trust language, "because it indicates an intention to establish a
> trust; but this may be rebutted."  89 Md. at 216, 43 A. 43.  The declaration
> of a trust transfers legal title to the trustee, and the beneficial interest passes
> to the *cestui que trust.*  89 Md. at 216, 218, 43 A. 43.  If the trust is
> challenged by an interested party or the estate's administrator, the burden of

proof lies with the challenger. Where a confidential relationship can be shown between the donor and the beneficiary, the burden shifts to the beneficiary to show that there was no undue influence. *Coburn v. Shilling,* 138 Md. 177, 199, 113 A. 761 (1921); *Bollack v. Bollack,* 169 Md. 407, 416, 182 A. 317 (1936); *Wenger, Adm. v. Rosinsky,* 232 Md. 43, 50, 192 A.2d 82 (1963).

The passbook entry in *Milholland II* differed from that in *Milholland I:* "Metropolitan Savings Bank, in account with Miss Elizabeth O'Neill. *In trust for herself and Mrs. Mary Whalen,* widow, joint owners, subject to the order of either; the balance at the death of either to belong to the survivor." (Emphasis supplied.) After stating the rule, the court found that Mrs. O'Neill intended to create a trust and that the funds passed to Mrs. Whalen, not by right of survivorship or by an *inter vivos* gift, but because Mrs. O'Neill held the money in trust for Mrs. Whalen should the latter happen to outlive her. *Milholland II,* 89 Md. at 218, 43 A. 43.

\* \* \*

The intent of the donor is a factual issue, and is determined at the time the entry in the passbook was made. *Ragan v. Kelly,* 180 Md. at 331, 24 A.2d 289. The case law generally focuses on the intent of the donor as to the creation of the trust itself; some cases, however, also allude to the intent of the donor as to the *result* of the trust's creation at the time it was created.

(Emphasis in original) (internal footnotes omitted).

Based on the language in *Barker* as derived from *Milholland I* and *II,* the issue of ownership becomes whether the victim gifted the money in the account to Wagner by adding her name to the Account's title, instead of creating a trust account. The following language in *Jones v. Hamilton*, 211 Md. 371, 376-77 (1956) is instructive:

In *Whalen v. Milholland*, 89 Md. 199, 202, 203, 43 A. 45, 47, 44 L.R.A. 208, the Court said: 'But much stress was laid on the words 'joint owners,' which were subsequently stamped on the pass book. Of themselves these two words, as we said in *Gorman v. Gorman*, supra, are not sufficient, in a deposit made in a Savings Bank, to transfer title to the fund; that is, they are not sufficient to convert the fund from being the property of the person to whom it belongs into the property of the original owner and another individual. Whatever their technical import may be when employed in

13

other instruments, they cannot operate to vest an ownership, to the extent of one-half of the fund in some one else, when, under the terms and according to the legal effect of the very paper in which they are used, the depositor retains such a dominion over the fund deposited that he may at any moment withdraw the whole of it. * * * Always bearing in mind that the fund belonged to only *one* of the parties named as joint owners, and that you are searching for evidence tending to show a gift of that fund, or of a part of it, to a person who confessedly, in the first instance, owned none of it, the control retained over the *whole* of it by the original owner, under the very terms of the deposit which he makes, is of great significance in repelling any inference that he intended to part with his ownership in any way whatever. Particularly is this so when the original owner retains possession of the pass book, and when the deposit is made in a Savings Bank, by the rules of which the book must be produced before the deposit can be withdrawn.'

The Court went on to point out that there would be an effective gift of the money on deposit under certain circumstances, saying: 'Where, however, it appears that the original owner purposely deposited the fund to his and another's credit, as joint owners, retaining the pass book so as to continue his dominion over the money, a distinct, unequivocal delivery of the book to the other person named as co-owner, with the intention to part with the ownership, and to make an irrevocable gift of the fund and an acceptance of it by the donee, would pass the whole interest therein to the donee, because there would then be no inconsistency between the legal effect of the entry on the book, and the right in which the donee of the book could claim the deposit, and there would no longer be a *locus penitentiae* in the original owner. Every element of a perfected gift would then be present.'

It was noted, however, that if the intent was to make the purported donee of the book an agent, and delivery of the book was to him in his capacity as agent, the result would be otherwise because title to the deposit would not pass.

(Emphasis in original).

This Court in *Stanley* reviewed the state of the law prior to the enactment of FI § 1-204. From our analysis of the act's legislative history, we concluded that the act "was intended to alter the common law," including *Milholland I*, *Milholland II*, and their progeny, as it applies to all deposit accounts established in the name of one or more

14

parties, whether in trust with survivorship rights or payable on death, with a financial institution.  In the context of death of one of the parties, the rebuttable presumption of a perfected gift created by adding a party as a joint owner that was available at common law was abrogated by statute, regardless of the entitlement of a party to make withdrawals.  *Stanley* settled the question of the limited application of FI § 1-204 ─ that of survivorship rights upon the death of one of the parties to the account, but not the issue to be addressed in this appeal.

### B.     *The Victim's Intent*

In approaching ownership of a bank account prior to the death of one of the parties, the current state of the law requires us to look to the intent of the victim and determine if he intended to make an irrevocable gift of ownership of the account.  Thus, the trial judge was correct in finding that titling an account as "joint owners" presumptively creates an ownership interest in both parties, but that presumption can be rebutted by evidence of a contrary intent of the original owner of the account.

Based on the record below, the trial judge had substantial evidence supporting her finding that Wagner was not an owner.  We recite the testimony of the victim as it establishes his intent in setting up the bank account.

> [VICTIM]:   That happened because I had my bank account with my wife's name on it, but since she passed away, I wanted somebody else to be able to get the money if I couldn't get it myself.  So I asked my daughter if I could put her name on the account and this is my money in there, but not hers, and she agreed to do that.
>
> STATE:      What specific instructions did you give her about putting your, her name on your account?

15

> [VICTIM]: The only reason I did that was in order for me to get my money out if I couldn't get it, would she be able to get it for me.
>
> STATE: Okay.
>
> [VICTIM]: That was my money.

The trial judge accepted the victim's testimony as an accurate portrayal of the victim's and Wagner's relationship:

> Both [Wagner] and [the victim] testified convincingly that each added the other to these accounts for the sole purpose of insuring that the funds could be accessed if necessary. But the funds, essentially, remained the funds of the person whose money it was, if that makes any sense . . . . [The victim]'s money was [the victim]'s money and [Wagner]'s money was [Wagner]'s money and what they did was put each other on the accounts in case something happened to one of them, that the money could be accessed.

Because the titling of the account in both the victim's and Wagner's names did not create an ownership interest in Wagner, we hold that the account was instead held as a joint trust account as recognized by *Milholland II*, *supra*. FI § 1-204 has no application because this case concerns facts and circumstances prior to death. Pursuant to CL § 7-101(h), Wagner was not an "owner" because she lacked an interest in the account and lacked authority to deplete the funds belonging to the victim in the Account.[15] Because Wagner was not an "owner" under CL § 7-101(h) or CL § 7-104, her conduct may be described as "theft," even though she was listed as a "joint owner."

---

[15] We note, here, that although Wagner had an ATM card, it did not give her authorized control over the account. The victim retained control over the checkbook and refused to surrender it to Wagner upon her request. Indeed, the victim made no overt action to surrender authority over the account and, in fact, had no knowledge of Wagner's ability to access the account because he did not know that an ATM card was ever issued.

16

Doubling down, Wagner argues that the trial judge should have relied on FI § 1-204 to find that the right of withdrawal allows the legal right to empty the funds from the account without any recourse for the victim.[16] We disagree. FI § 1-204 does not generally control this case, as the Financial Institutions Article seeks to define the relationship between a financial institution and its patrons (not between its patrons). The answer would be different, as we have discussed, if we were dealing with ownership upon death of one of the parties to the account under FI § 1-204.

As we have explained in *Stanley*, the right to withdraw does not equate to a right of ownership.[17] According to *Stanley*, 175 Md. App. at 265, "[t]he right of withdrawal does not create an ownership interest in the funds withdrawn that overrides the ownership

---

[16] In *Wright v. Commercial Sav. Bank*, 51 Md. App. 398, 403-04 (1982), *rev'd on other grounds*, 297 Md. 148 (1983), this Court said, "If one puts it in the power of another to so dispose of her money, the courts have no way to protect her against the betrayal of her confidence of folly, whichever you may call it. . . . Where an account is subject to the other of either party, each has a right so to change the account as to appropriate it to his own use or to transfer it from the names of both into his own name[.]" (Quoting *Wetzel v. Collins*, 170 Md. 383, 387 (1936) and M.L.E. *Trusts*, Chap. 10 § 286) (internal quotation marks and footnotes omitted).

Although the language in the *Wright* case appears to govern the outcome here, the import of our decision was not in the context we now must consider. In the *Wright* case, we sought to interpret a contractual relationship between the parties ― more specifically, we determined the obligation of a bank to its depositors where a joint account was opened with no evidence of a contractual relationship outside of the agreement between the account owners and the bank. We did not, however, come to any conclusions regarding the obligations of the account owners to each other.

[17] The factual disagreement concerning the intent when parties are named as joint tenants would be relevant to the question of the claim of unjust enrichment and to a claim of constructive trust. *See Stanley*, 175 Md. App. at 256 n.4. This Court in *Stanley* did not have to reach the issues because the circuit court was directed to enter summary judgment in favor of the appellant by operation of FI § 1-204(d). *Id*.

interest of the remaining survivors to the account, established by FI § 1–204(d)."

Following the logic of Wagner, a simple withdrawal from an account would create an ownership interest in anyone who withdraws money from that account, whether the parties intended that result or not.

Although FI § 1-204 lays out the different types of accounts that can be established to memorialize the agreement of the parties into the title of the account (*i.e.*, naming Wagner as a "convenience person" instead of a "joint owner"), the technical terminology employed by a bank in setting up an account under FI § 1-204 is inconsistent with the typical consumer's lexicon as understood in their relationship with their bank. This problem of translating the bank's language into a consumer's intent is not exclusive to our courts. As aptly put by the Oregon Supreme Court:

> Applied literally the language of the deposit agreement would create in the signatories in all cases a present concurrent ownership in the account. However, parties signing such an instrument ordinarily do not regard it as memorializing an agreement fixing their respective rights in the account in all of the various contingencies under which deposits are made and money is withdrawn. . . . [W]hen all of the funds in the account are deposited by only one of the signatories the recitation in the deposit agreement that the account is 'jointly owned' should not be treated as conclusively establishing the intent of the parties. To do so would be to give to the deposit agreement an effect which is normally not intended by those who open such accounts.

*Greenwood v. Beeson*, 454 P.2d 633, 635-36 (1969).[18]  Thus, even though Wagner was

---

[18] Both parties' briefs cited a number of cases from other states as persuasive authority on the question presented herein.  As we said in *Cates v.* State, 21 Md. App. 363, 372 (1974), "The rulings of courts of other states are classified not as binding, but as persuasive authority.  If the reasoning which supports them fails to persuade, they are no authority at all."  Although we quote the Oregon Supreme Court, we note that its

18

named as a "joint owner" in the parties' agreement with the bank, and not a convenience person, it does not determine conclusively that Wagner was an "owner" for the purpose of the criminal statute, CL § 7-104.

> **JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**

---

decision, as well as the decisions of any of our other sister states, does not bind this court in its decision-making process. After our own review of Maryland case law and Maryland statutes, we disagree with the parties that out-of-state cases should dictate this particular case's outcome.