Jacqueline Wagner v. State of Maryland, No. 11, September Term, 2015

**SUFFICIENCY OF THE EVIDENCE – MD CODE ANN., CRIM. LAW (2002, 2012 REPL. VOL.) § 7-104(a) – THEFT – MD. CODE ANN., FIN. INST. (1980, 2011 REPL. VOL.) § 1-204(f) – JOINT OR MULTIPLE-PARTY ACCOUNT – RIGHT OF WITHDRAWAL – OWNERSHIP – MD. CODE ANN., CRIM. LAW (2002, 2012 REPL. VOL.) § 7-113(a) – EMBEZZLEMENT (FRAUDULENT MISAPPROPRIATION BY FIDUCIARY) –** Court of Appeals held that: (I) evidence was sufficient to support conviction for theft where individual willfully or knowingly obtained or exerted unauthorized control over funds—belonging to another—contained in joint bank account without other's knowledge or consent and with intent to deprive other of those funds; statutorily granted authority permitting party to joint or multiple-party account to access and withdraw funds in account does not confer ownership of funds in account to that party such that, as a matter of law, party cannot be guilty of theft; and (II) evidence was sufficient to support conviction for embezzlement (fraudulent misappropriation by fiduciary).

IN THE COURT OF APPEALS

OF MARYLAND

No. 11

September Term, 2015

_____

JACQUELINE WAGNER

v.

STATE OF MARYLAND

_____

Barbera, C.J.
Battaglia
Greene
Adkins
McDonald
Watts
Harrell, Jr., Glenn T. (Retired,
Specially Assigned),

JJ.

_____

Opinion by Watts, J.
Barbera, C.J., Battaglia and Adkins, JJ., dissent.

_____

Filed: December 17, 2015

This case arises from the circumstance that a father and daughter were parties to a multiple-party bank account, and, without the father's permission, the daughter removed funds from the account to use for her own benefit, allegedly pursuant to Md. Code Ann., Fin. Inst. (1980, 2011 Repl. Vol.) ("FI") 1-204(f).[1]

We decide: (I) whether the evidence was sufficient to support a conviction for theft, and whether an individual can commit theft from a joint or multiple-party bank account to which the individual is a party; and (II) whether the evidence was sufficient to support a conviction for embezzlement (fraudulent misappropriation by fiduciary).

We hold that: (I) the evidence was sufficient to support the conviction for theft where the individual willfully or knowingly obtained or exerted unauthorized control over funds—belonging to another—contained in a joint bank account without the other's knowledge or consent and with the intent to deprive the other of those funds; statutorily granted authority permitting a party to a joint or multiple-party account to access and withdraw funds in the account does not confer ownership of the funds in the account to that party such that, as a matter of law, the party cannot be guilty of theft; and (II) the evidence was sufficient to support the conviction for embezzlement (fraudulent misappropriation by fiduciary).

---

[1]FI 1-204(f) provides: "Unless the account agreement expressly provides otherwise, the funds in a multiple-party account may be withdrawn by any party or by a convenience person for any party or parties, whether or not any other party to the account is incapacitated or deceased."

**BACKGROUND**

On February 14, 2013, the State, Respondent, charged Jacqueline Wagner ("Wagner"), Petitioner, with theft of property with a value of at least $500[2] and embezzlement (fraudulent misappropriation by fiduciary). On October 17 and 18, 2013, the Circuit Court for Baltimore County ("the circuit court") conducted a bench trial, at which the following evidence was adduced.

As a witness for the State, Marion Wagner ("Father"), who was eighty-four years old at the time of trial, testified as follows. Father had three daughters, including Wagner. For most of his life, Father lived in a row house on South Curley Street in Baltimore City with his wife, Jean, who died in 2005. While Jean was alive, she handled the family finances because "[s]he was very good with figures[.]" After Jean's death, Father handled his own finances for a short period of time before asking Wagner to assist him. At that time, Father had an individual retirement account ("the IRA") with American Century Investments containing nearly $200,000, and a checking account and a savings account (collectively, "the Account") with Provident Bank containing "a few thousand" dollars.[3]

---

[2]At the time of Wagner's alleged theft, Md. Code Ann., Crim. Law (2002, 2008 Supp.) ("CR") § 7-104(g) provided that a person convicted of theft of property or services with a value of less than $500 was guilty of a misdemeanor, whereas a person convicted of theft of property or services with a value of at least $500 was guilty of a felony. In 2009, the General Assembly amended CR § 7-104(g); as such, effective October 1, 2009, the threshold value that determines whether a theft is a misdemeanor or a felony was increased to $1,000. See 2009 Md. Laws 3666, 3666-68 (Ch. 655, H.B. 66).

[3]In 2009, the Account was transferred to M&T Bank following M&T Bank's acquisition of Provident Bank. Eileen Ambrose, *Merger gets OK*, Balt. Sun, Apr. 9, 2009, available at < http://articles.baltimoresun.com/2009-04-09/business/0904080114_1_com munity-bank-bank-corp-mt-bank > [ https://perma.cc/UGB2-UHFQ ].

Father also received a monthly pension check in the amount of $88 and income from the Social Security Administration.

On July 29, 2005, Father added Wagner to the Account as a "joint owner." At trial, as to that event, the following exchange occurred:

> [PROSECUTOR]: Okay. Now, 2005, you indicated that you put [] Wagner on your account. Why did that happen?
>
> [FATHER]: That happened because I had my bank account with my wife's name on it[,] but[,] since she passed away, I wanted somebody else to be able to get the money if I couldn't get it myself. So I asked [Wagner] if I could put her name on the account[,] and this is my money in there, but not hers, and she agreed to do that.
>
> [PROSECUTOR]: Well, what specific instructions did you give her about putting your, her name on your account?
>
> [FATHER]: The only reason I did that was in order for me to get my money out if I couldn't go get it, would she be able to get it for me.
>
> [PROSECUTOR]: Okay.
>
> [FATHER]: That was my money.

Father retained the checkbook for the Account, and "never knew [that he] had" an ATM card. Father did not let anybody else have the checkbook for the Account except when he gave it to Wagner on one occasion.

In 2006, Father mortgaged his house for $87,000,[4] and loaned the proceeds to Wagner to help with Wagner's business of transporting people to and from bingo halls.[5]

---

[4]At other points, Father testified that he mortgaged his house in 2004 or at some other time before his wife died.

[5]Father testified that he occasionally drove for Wagner's business, but was not compensated for his time. Father further testified that he patronized Wagner's business so

Father expected Wagner to "pay [the loan] back completely."

In January 2007, after his house was damaged by a fire, Father moved into Wagner's home in Baltimore County. Father received $40,000 from his insurance company to pay for the cost of repairs to his house.[6] Father put Wagner in charge of the repairs and instructed "her to do whatever she want[ed] to get the house in shape" and "to pay the contractor whatever [s]he ha[d] to pay." In 2009, the repairs to Father's house were finished. Wagner "talked [Father] into letting [his] granddaughter and her boyfriend [] move into [Father's] house"; as a result, Father kept living with Wagner. In late 2009, Wagner told Father that he needed to move out, so he moved out of Wagner's house and moved in with one of his other daughters.[7]

Before moving out of Wagner's house, Father received a statement from his bank informing him that the mortgage on his house had not been paid; the bank threatened to initiate foreclosure proceedings. After receiving the statement, Father telephoned his bank and discovered that the mortgage had not been paid and that he owed his bank $60,000.[8] When he asked the bank about the amount of funds in the Account, Father "was astonished to find out that it was nothing." The money in the IRA and the Account was missing. For

that he could play bingo, and that he would sometimes have Wagner withdraw funds from the Account for that purpose. According to Father, on those occasions, he asked Wagner to withdraw "hundreds[,]" but not thousands, of dollars.

[6]The record does not reveal whether the insurance proceeds were deposited into the Account.

[7]Father testified that, while living with Wagner, he did not pay rent or other household bills. Wagner testified that, although Father did not pay her while living with her, Father continued to pay household bills for his house.

[8]Father testified that, in 2010, he sold his house because he had insufficient funds to pay the mortgage.

several months thereafter, Father requested and reviewed copies of his bank records to find out what had happened to the funds in the Account and the IRA. In 2010, Father went to a Commissioner Station of the District Court of Maryland and filed a complaint against Wagner.

Father had not authorized Wagner to transfer funds from the IRA to the Account, make numerous ATM and cash withdrawals from the Account, or transfer funds from the Account to Wagner's personal checking account[9] or the bank accounts of companies (KLMJ Inc. and Smythe Transportation) that Wagner owned.[10] Father did not know the full extent of the withdrawals and transfers until he started reviewing his bank records.

As a witness for the State, Detective Deborah Chenoweth ("Detective Chenoweth") of the Baltimore County Police Department testified that she was assigned to investigate the matter, and that her investigation revealed that, from December 9, 2005, to October 13, 2009, $181,670.09 was transferred from the IRA to the Account,[11] and $251,645.83 was taken from the Account through ATM withdrawals, cash withdrawals, and wire transfers to Wagner's personal checking account and the bank accounts of companies that Wagner owned. In other words, funds would be transferred from the IRA to the Account, and

---

[9]Wagner testified that her personal checking account was jointly owned with Father as of 2002, when she "added [Father] on as a joint owner[.]"

[10]An employee of M&T Bank testified that the signature card for KLMJ, Inc. identified Wagner as an owner, and that the signature card for Smythe Transportation identified Wagner as an authorized signer for the account.

[11]Later during Detective Chenoweth's testimony, the prosecutor characterized the time period during which funds were transferred from the IRA to the Account as "May of '06 till the end of September 2009[.]" Because the precise dates are not at issue in this case, we use the dates that Detective Chenoweth used.

thereafter would be withdrawn by ATM or cash or transferred by wire from the Account to Wagner's personal checking account or the bank accounts of companies that Wagner owned. The circuit court admitted into evidence a Provident Bank signature card, which was dated July 29, 2005, identified the Account, and listed Father as the "Primary Owner." The signature card's middle section contains Father's and Wagner's signatures and Social Security numbers, and labels each of Father and Wagner as a "Joint Owner."

On her own behalf, Wagner testified as follows. Wagner was "put on [the A]ccount in case anything happened to" Father. Wagner put money into the Account, but she had "[n]o idea" how much. Wagner sometimes gave Father money out of her personal checking account (which was a joint account with Father) and sometimes transferred money between the Account and her personal checking account. Father received his bank statement every month and balanced his checkbook, so Father knew exactly "what he had" and "what he was using and spending."

As to the IRA, originally, Father withdrew funds from the IRA by mailing a form; Father would then receive in the mail a check, which he would deposit. After Father began living with Wagner, Father informed her that he did not want to deal with "everyday things," including money, so he authorized her to handle telephonic withdrawals from the IRA. Wagner was required to fax a form confirming any telephonic withdrawal; after the form was processed, money from the IRA was deposited into the Account. Wagner did not take any money out of the IRA without Father's authorization because it was "his money." Wagner did not sign Father's name on the requests for withdrawals from the IRA.

All of the money taken out of the Account was at Father's request. Father always

used cash and never had a credit card or a debit card. Wagner never took money from the Account or the IRA for her own benefit or without Father's authorization. Wagner acknowledged that the money deposited into the Account was Father's money, and that her "money was kept separate from [Father's] money." Father gave Wagner the proceeds of the $87,000 mortgage "as a gift[,]" but Wagner paid the mortgage when she had "extra money[.]" Wagner failed to pay the general contractor for the work on Father's house. When asked whether she gave Father $200,000 over the course of three years to "lose at the casinos[,]" Wagner testified "[p]ossibly" and explained: "It's [Father's] money. He wanted it, he got it, he did what he wanted with it."

At the conclusion of the bench trial, the circuit court found that Wagner took funds from the Account, finding as follows:

> I have absolutely no question in my mind, none, that [Wagner] took and used the money in [the A]ccount . . . for her own purposes. I am truly well beyond hav[ing] a reasonable doubt. I have no doubt. I reject factually as strongly as I can that [Wagner] withdrew funds at [Father]'s request and that that money was lost gambling.

After issuing its factual findings, the circuit court observed that the case presented a legal, not factual, question. Specifically, the circuit court stated: "I really think factually there's no question about what happened. I think it's much more of a legal question. . . . I have, frankly, spent the majority of my time[] trying to figure out what is, what are the consequences or ramifications of a joint account." As to legal conclusions, the circuit court stated:

> [T]here is, in fact, a rebuttable presumption. There's a difference between ownership and ability to withdraw[,] and one starts with the presumption that[,] in a case where there's joint ownership with a right of survivorship,

which is created by the titling of the account, that it's joint owners. But it can be rebutted and the burden is on the person who wants to rebut it. . . . I'm reading to you from *Haller v. White*, [228 Md. 505, 510, 180 A.2d 689, 692 (1962), superseded by, Md. Code Ann., Fin. Inst. (1980, 2011 Repl. Vol.) §1-204] it says we think the most significant fact is the form of the account, which on its faces creates a joint tenancy. It is true that this raises only a rebuttable presumption[,] but the burden is upon the party seeking to rebut it. In [] *Stanley*[ *v. Stanley*, 175 Md. App. 246, 262, 927 A.2d 40, 50, cert. dismissed, 402 Md. 36, 935 A.2d 406 (2007)], the common law presumption of joint ownership with the right of survivorship created by the titling of the bank account as joint can be overcome by evidence that the owner's intent was not to create such rights in the titleholder. I have really struggled, I make no bones about it, over this issue of ["]can you actually have a situation where there's theft when the titling is joint owners[?",] and I come down on the side that you can[,] and that is because I am persuaded that[,] even if one starts with this presumption that it's joint owners, it can be rebutted[,] and I have found in this case, as I said, . . . it's not beyond a reasonable doubt, it is beyond all doubt.

The circuit court found Wagner guilty of both theft of property with a value of at least $500 and embezzlement (fraudulent misappropriation by fiduciary).

On October 21, 2013, the circuit court sentenced Wagner to eight years' imprisonment, with all but eighteen months suspended, for theft of property with a value of at least $500, followed by five years' supervised probation; the circuit court also ordered Wagner to pay $122,355 in restitution to Father.[12] For sentencing purposes, the conviction for embezzlement (fraudulent misappropriation by fiduciary) merged with the conviction for theft of property with a value of at least $500.

Wagner appealed, and the Court of Special Appeals affirmed. See Wagner v. State,

---

[12]The circuit court arrived at the amount of restitution by examining what money "went directly" from the Account "into [] Wagner's [personal] checking account . . . , the Smythe Transportation business account, . . . and the KLMJ Inc. business account[.]" The circuit court did not make any findings concerning the mortgage or other withdrawals from the IRA.

220 Md. App. 174, 194, 102 A.3d 900, 912 (2014).  Wagner filed a petition for a writ of

*certiorari*, which this Court granted.  See Wagner v. State, 441 Md. 666, 109 A.3d 665

(2015).

## STANDARD OF REVIEW

Maryland Rule 8-131(c) provides:

When an action has been tried without a jury, the appellate court will review the case on both the law and the evidence.  It will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses.

In Goff v. State, 387 Md. 327, 338, 875 A.2d 132, 138-39 (2005), we further explained the

standard of review under Maryland Rule 8-131(c), stating:

The deference shown to the trial court's factual findings under the clearly erroneous standard does not, of course, apply to legal conclusions.  When the trial court's decision involves an interpretation and application of Maryland statutory and case law, [this] Court must determine whether the lower court's conclusions are legally correct under a *de novo* standard of review.

We will not disturb the judgment on the facts, however, unless the trial court's findings are clearly erroneous.  If there is any competent evidence to support the factual findings of the trial court, those findings cannot be held to be clearly erroneous.

(Citations, internal quotation marks, and brackets omitted).

As to sufficiency of the evidence, "[t]he standard for appellate review of evidentiary

sufficiency is whether, after viewing the evidence in the light most favorable to the [State],

any rational trier of fact could have found the essential elements of the crime beyond a

reasonable doubt."  State v. Smith, 374 Md. 527, 533, 823 A.2d 664, 668 (2003) (citations

omitted).  In so evaluating, "[w]e do not re-weigh the evidence, but we do determine

whether the verdict was supported by sufficient evidence, direct or circumstantial, which could convince a rational trier of fact of the defendant's guilt of the offenses charged beyond a reasonable doubt." Id. at 534, 823 A.2d at 668 (citation and internal quotation marks omitted).

Because the issue in this case involves statutory interpretation, we set forth the pertinent rules of statutory construction:

> The cardinal rule of statutory construction is to ascertain and effectuate the intent of the [General Assembly].
>
> As this Court has explained, [t]o determine that purpose or policy, we look first to the language of the statute, giving it its natural and ordinary meaning. We do so on the tacit theory that the [General Assembly] is presumed to have meant what it said and said what it meant. When the statutory language is clear, we need not look beyond the statutory language to determine the [General Assembly]'s intent. If the words of the statute, construed according to their common and everyday meaning, are clear and unambiguous and express a plain meaning, we will give effect to the statute as it is written. In addition, [w]e neither add nor delete words to a clear and unambiguous statute to give it a meaning not reflected by the words [that] the [General Assembly] used or engage in forced or subtle interpretation in an attempt to extend or limit the statute's meaning. If there is no ambiguity in th[e] language, either inherently or by reference to other relevant laws or circumstances, the inquiry as to legislative intent ends[.]
>
> If the language of the statute is ambiguous, however, then courts consider not only the literal or usual meaning of the words, but their meaning and effect in light of the setting, the objectives[,] and [the] purpose of [the] enactment [under consideration]. We have said that there is an ambiguity within [a] statute when there exist[] two or more reasonable alternative interpretations of the statute. When a statute can be interpreted in more than one way, the job of this Court is to resolve that ambiguity in light of the legislative intent, using all the resources and tools of statutory construction at our disposal.
>
> If the true legislative intent cannot be readily determined from the statutory language alone, however, we may, and often must, resort to other recognized indicia—among other things, the structure of the statute, including its title; how the statute relates to other laws; the legislative history, including the

derivation of the statute, comments and explanations regarding it by authoritative sources during the legislative process, and amendments proposed or added to it; the general purpose behind the statute; and the relative rationality and legal effect of various competing constructions.

In construing a statute, [w]e avoid a construction of the statute that is unreasonable, illogical, or inconsistent with common sense.

In addition, the meaning of the plainest language is controlled by the context in which is appears. As this Court has stated, [b]ecause it is part of the context, related statutes or a statutory scheme that fairly bears on the fundamental issue of legislative purpose or goal must also be considered. Thus, not only are we required to interpret the statute as a whole, but, if appropriate, in the context of the entire statutory scheme of which it is a part.

Stoddard v. State, 395 Md. 653, 661-63, 911 A.2d 1245, 1249-50 (2006) (citations, internal quotation marks, and paragraph break omitted) (some alterations in original).

## DISCUSSION

### I.

Wagner contends that, as a matter of law, absent language in an account agreement restricting a person's use of funds, a person cannot be guilty of theft from a joint or multiple-party bank account if the person is a party to the bank account. Wagner argues that, because she was a party to the Account, she was an owner of the funds in the Account and had the right to withdraw funds from the Account, and accordingly could not be guilty of stealing her own property. Indeed, Wagner asserts that, under FI § 1-204(f), she had full authority to exert control over the funds in the Account as a party to the Account, and her ability to legally withdraw funds from the Account constituted an ownership interest in those funds. Wagner maintains that because she was a party to the Account, "[t]here was no restriction on her withdrawal of funds."

The State responds that the evidence is sufficient to sustain the conviction for theft because Wagner withdrew funds from the Account without Father's authorization and used them for her benefit, not Father's. Indeed, the State contends that Wagner "plainly committed theft" because she took funds from the Account for her own use and without Father's authorization. The State argues that FI § 1-204 does not shield Wagner from criminal liability for her unauthorized taking and use of Father's funds because FI § 1-204 concerns account access, not account ownership. The State asserts that FI § 1-204(f) does not confer ownership of an account, but instead provides authorization to withdraw funds from an account absent some other agreement between the financial institution and the parties to the account.

Md. Code Ann., Crim. Law (2002, 2012 Repl. Vol.) ("CR") § 7-104(a)[13] provides:

A person may not willfully or knowingly obtain or exert unauthorized control over property, if the person:

(1) intends to deprive the owner of the property;

(2) willfully or knowingly uses, conceals, or abandons the property in a manner that deprives the owner of the property; or

(3) uses, conceals, or abandons the property knowing the use, concealment, or abandonment probably will deprive the owner of the property.

For purposes of the theft statute, CR § 7-101(h) defines "owner" as "a person, other than the offender: (1) who has an interest in or possession of property regardless of whether the person's interest or possession is unlawful; and (2) without whose consent the offender has

---

[13]Although the General Assembly has amended CR § 7-104 multiple times since 2005 (when Wagner began removing funds from the Account and the IRA), none of the recent amendments affect our analysis; thus, we refer to CR § 7-104's current version.

no authority to exert control over the property." (Paragraph breaks omitted). CR § 7-101(j) defines "property of another" as "property in which a person other than the offender has an interest that the offender does not have the authority to defeat or impair, even though the offender also may have an interest in the property."

Here, we hold that, viewing the evidence in the light most favorable to the State, the evidence was sufficient to support the conviction for theft. As of 2005, the IRA contained nearly $200,000, and the Account contained "a few thousand" dollars. On July 29, 2005, Father added Wagner to the Account as a "joint owner." Between December 2005 and October 2009, $181,670.09 was transferred from the IRA to the Account. During that same time, $251,645.83 was taken from the Account through ATM withdrawals, cash withdrawals, and wire transfers to Wagner's personal checking account and the bank accounts of companies that Wagner owned.[14] Father testified that he did not authorize Wagner to transfer funds from the IRA to the Account, make numerous ATM and cash withdrawals, or transfer funds from the Account to Wagner's personal checking account or the bank accounts of companies that Wagner owned. Indeed, Father testified that he did not know the full extent of the withdrawals and transfers until he started reviewing his bank records after moving out of Wagner's house. Put simply, the evidence adduced at trial was sufficient to support the circuit court's finding that Wagner "took and used the money in [the Account] for her own purposes" and did so without Father's knowledge or

---

[14]The evidence demonstrated that funds would be transferred from the IRA to the Account, and thereafter would be withdrawn from the Account by ATM or cash or by wire transfer to Wagner's personal checking account or the bank accounts of companies that Wagner owned.

authorization. In other words, Wagner willfully or knowingly obtained or exerted unauthorized control over the funds in the IRA and the Account with the intent to deprive the owner (Father) of those funds in violation of CR § 7-104(a).

Significantly, Wagner does not dispute in any meaningful way the circuit court's factual findings that: (1) Father added Wagner to the Account to allow Wagner to access the funds in the Account if something happened to Father or for Father's benefit; (2) Wagner understood that the money in the Account belonged to Father; and (3) Wagner withdrew funds from the Account and used them for her own purposes. Indeed, rather than attacking the evidentiary basis for the conviction for theft of property with a value of at least $500, Wagner relies exclusively on FI § 1-204(f) to contend that, as a party to the Account, she was an owner of the funds in the Account and had the legal authority to access the Account and exercise control over the funds, such that she could not be convicted of stealing her own property. We disagree. Stated simply, FI § 1-204(f) does not mention, let alone implicate, the ownership rights among living parties to a joint or multiple-party account; instead, FI § 1-204(f) provides that a party to a joint or multiple-party account may access and withdraw funds in the account. We explain.

FI § 1-204(f) provides, in its entirety: "Unless the account agreement expressly provides otherwise, the funds in a multiple-party account may be withdrawn by any party or by a convenience person for any party or parties, whether or not any other party to the account is incapacitated or deceased." FI § 1-204(b)(5) defines a "convenience person" as:

[A]ny person who is authorized to drawn upon funds in an account: (i) Under

- 14 -

a power of attorney given by 1 or more parties to the account; or (ii) By virtue of a designation in the account agreement appointing that person as agent of a party or the parties to the account for the convenience of the party or parties.

(Paragraph breaks omitted). By its plain language, FI § 1-204(f) simply grants a party or a convenience person to a joint or multiple-party account the authority to access the account and withdraw funds, absent language in the account agreement expressly providing otherwise; FI § 1-204(f) does not confer ownership of the funds in the account to the party or the convenience person. Indeed, FI § 1-204(f) does not delineate or detail the relationship among the parties to a multiple-party account; instead, FI § 1-204(f) concerns the relationship between the parties to a multiple-party account and the financial institution where the account is held, as memorialized in an account agreement between the financial institution and the parties to the multiple-party account.

In short, the issue is whether a party authorized to withdraw under FI § 1-204(f) is an "owner" of the property as defined by CR § 7-101(h)(1) and (2). In other words, does having the ability to withdraw funds pursuant to FI § 1-204(f) create an interest in or give ownership of the property to a party to the account? We conclude that FI § 1-204(f) does not create an interest in property or give ownership of property to the party authorized to withdraw. See Black's Law Dictionary (10th ed. 2014) ("Interest" is defined, in pertinent part, as "[a] legal share in something; all or part of a legal or equitable claim to or right in property[.]"). By its plain language, FI § 1-204(f) authorizes only the act of withdrawal from a multiple-party account, nothing more and nothing less. The ordinary meaning of the term "withdrawal" (the noun form of the verb "withdrawn" in FI § 1-204(f)) does not convey or suggest that an individual who engages in a withdrawal expressly or impliedly

becomes an owner of the withdrawn funds.  See Black's Law Dictionary (10th ed. 2014)

("Withdrawal" is defined, in pertinent part, as "[t]he removal of money from a

depository[,]" *e.g.*, "withdrawal of funds from the checking account[.]"); Withdrawal,

Merriam-Webster    (2015),    http://www.merriam-webster.com/dictionary/withdrawal

[https://perma.cc//YLU4-CGNJ ] ("Withdrawal" is defined, in pertinent part, as "removal

from a place of deposit or investment[.]").  Nothing in FI § 1-204(f) uses the term

"ownership" or a synonym; nor does FI § 1-204(f) contain any terms concerning ownership

of the funds that may be withdrawn from a multiple-party account.  In short, FI § 1-204(f)'s

plain language says nothing about the ownership interests, or lack thereof, of those

individuals who are authorized to make withdrawals from a multiple-party account.  As

such, equating the authority to withdraw with ownership strains the clear language of FI §

1-204(f) beyond recognition.[15]

A review of FI § 1-204's legislative history does not change the result or alter the

plain meaning of FI § 1-204(f).  Indeed, FI § 1-204's legislative history demonstrates that

the General Assembly enacted FI § 1-204 to repeal the rules as to gift and trust that formerly

governed the joint or multiple-party accounts of deceased individuals.  In 1992, the General

Assembly passed House Bill 956 (which became, among other statutes, FI § 1-204), for

---

[15]Moreover, we observe that to equate the authority to withdraw with ownership under FI § 1-204(f) would mean that a convenience person—who is authorized under FI § 1-204(f) to withdraw funds from a multiple-party account—is an owner of the funds in the account.  This result obviously conflicts with the definition of a convenience person in FI § 1-204(b)(5), as well as the clear dictate of FI § 1-204(i)(2), which provides, in no uncertain terms, that "[n]o funds in the account shall belong to any convenience person by reason of that capacity."

the purpose of, among other things, "authorizing certain persons to withdraw funds in a multiple-party account under certain circumstances[,]" "providing that financial institutions may make payments from multiple-party accounts to certain persons without liability under certain circumstances[,]" and "providing for the effect of [FI § 1-204] on common law[.]" 1992 Md. Laws 3498 (Ch. 578, H.B. 956). Indeed, in an uncodified section of FI § 1-204, the General Assembly stated:

> [FI § 1-204] is intended to alter the common law, including Whalen v. Milholland, 89 Md. 199, 43 A. 45 (1899), Milholland v. Whalen, 89 Md. 212, 43 A. 43 (1899) and their progeny, as it applies to all deposit accounts in financial institutions that are established in the name of one or more parties, whether or not in trust, or with survivorship rights, or with payable on death rights.

1992 Md. Laws 3498, 3507 (Ch. 578, H.B. 956).

Before continuing with our review of FI § 1-204's legislative history and, specifically, House Bill 956's file, we pause to provide context concerning the common law that was intended to be altered by FI § 1-204. The common law at issue developed through cases concerning "contest[s] between those claiming as co-owners or as surviving owner of a bank or building association account[.]" Jones v. Hamilton, 211 Md. 371, 380, 127 A.2d 519, 526 (1956). The first of these cases were Whalen v. Milholland, 89 Md. 199, 200, 43 A. 45, 46 (1899) ("Milholland I") and Milholland v. Whalen, 89 Md. 212, 212-13, 43 A. 43, 43 (1899) ("Milholland II"), both of which involved bank accounts opened by Elizabeth O'Neill ("O'Neill") and the contest between O'Neill's sister, Mary Whalen ("Whalen"), and the executor of O'Neill's estate, Arthur V. Milholland ("Milholland"), as to who was entitled to the funds in the accounts after O'Neill died. In

Milholland I, 89 Md. at 200, 43 A. at 46, O'Neill opened a bank account at the Savings Bank of Baltimore titled as follows: "Elizabeth O'Neill and Mary Whalen. Joint owners. Payable to the order of either, or the survivor"; the words "joint owners" were not originally on the form, but were stamped on later. In Milholland II, 89 Md. at 212-13, 43 A. at 43, O'Neill opened a bank account at Metropolitan Savings Bank titled as follows: "Metropolitan Savings Bank, in account with Miss Elizabeth O'Neill. In trust for herself and Mrs. Mary Whalen, widow, joint owners, subject to the order of either; the balance at the death of either to belong to the survivor." The titling of the account at Metropolitan Savings Bank "was made at the instance and upon the request of [] O'Neill" and embodied the instructions that O'Neill gave Metropolitan Savings Bank when she opened the account. Milholland II, 89 Md. at 213, 43 A. at 43. O'Neill funded the bank accounts and held the accounts' pass books, which were required to withdraw funds. Milholland I, 89 Md. at 200, 203, 43 A. at 46, 47; Milholland II, 89 Md. at 213, 43 A. at 43. After O'Neill died, both Whalen and Milholland claimed the funds in the accounts. Milholland I, 89 Md. at 200-01, 43 A. at 46; Milholland II, 89 Md. at 213, 43 A. at 43.

In Milholland I, 89 Md. at 202, 43 A. at 46, this Court held that the funds in the account at the Savings Bank of Baltimore belonged to O'Neill's estate because Whalen failed to demonstrate that O'Neill had validly gifted her the funds in the account before O'Neill's death. We explained that the words "joint owners" in the title of the account, standing alone, were "not sufficient" to transfer title to the funds to Whalen or to establish a gift, particularly because O'Neill "retain[ed] possession of the pass book, and . . . the book must be produced before the deposit can be withdrawn." Milholland I, 89 Md. at

- 18 -

202-03, 43 A. at 47. We noted that the later addition of the words "joint owners" to the title of the account was of no significance, explaining:

> Those words were placed on the [pass] book, not because [] O'Neill requested the bank officers to do so, and not because *she* thought they would, or designed they should[,] vest an indefeasible interest in [Whalen], but merely because the bank had adopted that form, as testified by the assistant treasurer, "to make it uniform[,]"—though uniform with what[,] he did not say. The words were put there[,] not as expressing [] O'Neill's intentions[,] or as limiting her control over the funds, but manifestly to carry out some policy or theory of the Savings Bank [of Baltimore]. They represent and stand for no voluntary, deliberate act of hers at all. In the face of these facts, whatever the import of the words might be, had they been consciously and purposely used by [] O'Neill, they certainly can be given no weight or potency.

Milholland I, 89 Md. at 203-04, 43 A. at 47 (emphasis in original).

By contrast, in Milholland II, 89 Md. at 215, 43 A. at 45, this Court held that the language used by O'Neill in opening the account at Metropolitan Savings Bank demonstrated O'Neill's intent to grant an ownership interest in the funds of the account to Whalen; *i.e.*, the funds in the account belonged to Whalen, as the beneficiary of the trust, and not to O'Neill's estate. We stated that "a deposit [such] as we [we]re [then] dealing with[] constitute[d] a valid declaration of trust, in the absence of contravening proof, and [] when a trust [was] thus created[,] the rights of the beneficiary become fixed, even though the settlor retains the [pass ]book in his [or her] possession." Milholland II, 89 Md. at 218, 43 A. at 45. We explained:

> [O'Neill] was seized of the money for the use of herself and her sister, as joint owners of the equitable interest; and both were authorized to draw the funds upon producing the [pass ]book. This is not all. . . . By the terms of the declaration of trust, upon the death of [] O'Neill[,] the balance on deposit became [] Whalen's property, not by a gift and delivery of the [pass ]book, nor by the right of survivorship as one of two joint owners, nor by a gift of

- 19 -

the funds *inter vivos*, but purely and exclusively because the trust . . . stripped [] O'Neill of her individual ownership of the money, and vested the money in her in trust, as to this balance, for [] Whalen, if the latter happened to outlive [] O'Neill.

Milholland II, 89 Md. at 218, 43 A. at 45.

Milholland I, Milholland II, and their offspring established in the common law the general principle that "the usual entry 'A in trust for A and B, joint owners, balance at the death of either to belong to the survivor' is, unexplained, a sufficient declaration of trust, since it indicates an intention to establish the trust[.]" Bierau v. Bohemian Bldg., Loan & Sav. Ass'n, "Slavie" of Balt. City, 205 Md. 456, 461, 109 A.2d 120, 123 (1954). Also established in the common law was the corresponding general principle that, "[i]f there was no intention to create a trust, none will be held to exist[,] no matter what words are used." Id. at 461, 109 A.2d at 123 (footnote omitted). In other words, cases following Milholland I and Milholland II involving claims of ownership of a joint or multiple-party account focused on the intention of the creator of the joint or multiple-party account.

Indeed, following Milholland I and Milholland II, "[i]n every case, the real purpose and intention of the donor, and not the [] use of one particular term or another, w[ould] decide the question of whether there was a trust." Bierau, 205 Md. at 462, 109 A.2d at 123 (footnote omitted); see also Jones, 211 Md. at 380, 127 A.2d at 526 ("The distillation of the Maryland cases is that[,] in a contest between those claiming as co-owners or as surviving owner of a bank or building association account, th[is] Court has sought to find who was the original owner of the money on deposit, the intention of the owner as to the fund, the mechanics employed to effectuate that intent, and their effectiveness.").

Nevertheless, over time, this Court's "decisions decided subsequent to *Milholland I* and *Milholland II* [] substantially 'blended' the distinction between the types of accounts discussed in those cases[, *i.e.*, blurred the distinction between gift and trust,] and suggest[ed] that the surviving owner of a joint account may have survivorship rights upon the death of the depositor, even in the absence of 'trust' language on the titling document." Hartlove v. Md. Sch. for the Blind, 111 Md. App. 310, 344, 681 A.2d 584, 600 (1996), vacated on other grounds, 344 Md. 720, 690 A.2d 526 (1997) (per curiam) (citations omitted). Indeed, Milholland I, Milholland II, and their progeny "precipitated some uncertainty concerning ownership of multiple-party bank accounts following the death of the account holder." Stanley v. Stanley, 175 Md. App. 246, 262, 927 A.2d 40, 50, cert. dismissed, 402 Md. 36, 935 A.2d 406 (2007). In response, the General Assembly enacted FI § 1-204. See Stanley, 175 Md. App. at 262, 927 A.2d at 50 (The Court of Special Appeals stated that "the General Assembly enacted . . . FI § 1-204" "[t]o resolve th[e] uncertainty" "concerning ownership of multiple-party bank accounts following the death of the account holder."); Hartlove, 111 Md. App. at 343 n.16, 681 A.2d at 600 n.16 (The Court of Special Appeals noted that the General Assembly enacted FI § 1-204 "to alter the common law" and to "'release[] courts from the gift and trust tests for determining where funds should go'" following the death of a party to a multiple-party account. (Citation omitted)).

That FI § 1-204 was intended to change the common law principles applicable to multiple-party accounts following the death of an individual is evident throughout House Bill 956's file. For example, House Bill 956's "Bill Analysis," prepared by the House

Economic Matters Committee, stated that House Bill 956 was intended to alter the common law and provided the following information as background:

> Currently, common law and case law govern the rights of parties with regard to multiple party accounts. There are two basic forms of multiple party accounts, the Trust Form and the Joint Form. The Trust Form reads "A in trust for A and B, subject to the order of either, balance on the death of either to the survivor"; the Joint Form reads "A and B as joint owners, subject to the order of either, balance on the death of either to the survivor".

> Under the Milholland cases (decided in 1899), on the death of one of the depositors, the assets in a joint account belong to the survivor if the account was in a Trust Form for the benefit of the survivor; conversely, if the Joint Form was used instead of the Trust Form, the assets in the account belong to the estate of the deceased depositor regardless of any other language in the contract creating the account.

House Bill 956's "Bill Analysis" explained, to that end, that one of the changes or effects on current and future accounts would be that "[e]ach account agreement for a multiple-party account opened on or after January 1, 1992, must contain a clear and conspicuous written statement specifying that, unless contrary direction is given in the account agreement, upon the death of a party, the funds in the multiple-party account shall belong to the surviving party or parties." Indeed, House Bill 956's "Bill Analysis" emphasized survivorship rights, stating as follows:

RIGHTS OF PARTIES

Death of a Party

> The bill sets out the rights of parties in multi-party accounts. The basic rule is that, upon the death of a party to a multiple-party account, the right to any funds in the account is determined under the express terms of the account agreement.

> If the account agreement does not expressly establish the right to funds in the account upon the death of a party, or if there is no account

agreement, any funds in the account upon the death of a party belongs [sic] to the surviving party or parties.

(Emphasis omitted). Language identical to that contained in House Bill 956's "Bill analysis" is contained in House Bill 956's "Floor Report."

Concerns about survivorship rights, or what occurred after the death of an individual who was party to a multiple-party account, were also expressed elsewhere in House Bill 956's file. According to a document submitted by the Maryland Bankers Association,[16] House Bill 956's purpose was to "establish[] a statutory framework for the creation of 'multiple-party' deposit accounts and for the determination of the rights of persons who claim to have an interest in multiple-party deposit accounts." The Maryland Bankers Association explained why House Bill 956 was needed, stating:

> Currently[,] there is no comprehensive Maryland law governing how to establish deposit accounts with multiple parties or how to determine who has rights in deposit account funds when more than one person is named on the account. Instead, deposit accounts are governed by various contradictory statutes scattered throughout the Maryland Code and by a series of cases first decided at the turn of the century. **Current Maryland law often leads to uncertainty as to who has rights to funds in an account both during the life of[,] and after the death of[,] one or more persons named on an account. This uncertainty leads to disputes between a deceased account holder's estate and other persons who assert ownership of account funds.** Moreover, current Maryland law is in conflict with the law applied by the [Federal Deposit Insurance Corporation] to establish ownership interests in jointly held accounts.

(Emphasis added). The Maryland Bankers Association observed that, "[i]f the account agreement is silent as to the rights of the[] various individuals, then House Bill No. 956

---

[16]The two-page document—entitled "House Bill No. 956[,] Financial Institutions – Multiple-Party Accounts"—is undated and unsigned.

[would] provide[ that] an account party w[ould] have a right to funds in the account (i.e., w[ould] have survivorship rights) upon the death of another account party[.]"

Jeffrey J. Radowich, the Chair-Elect of the Section of the Estate and Trust Law of the Maryland State Bar Association, testified in support of House Bill 956's substantially identical counterpart, Senate Bill 756, explaining the problem posed by the then-existing common law as follows:

> The current state of the law is confusing[,] leads to uncertain results, and frustrates the intent[] of Maryland citizens. A person thinks [that] he or she has established an account at a financial institution [that] will pass on that person's death to another surviving person, but[,] after death[,] it turns out that the form of the account does not bring about that result. Instead, the property gets paid to the probate estate, and often ends up in the hands of an entirely different person.

Testimony of Jeffrey J. Radowich, Chair-Elect, Section of Estate and Trust Law, Maryland State Bar Association, in Support of S.B. 756 (Feb. 28, 1991). Radowich testified that the problem was aggravated because "[d]ifferent financial institutions use various forms of language to describe the different kinds of multiple[-]party deposit accounts, compounding the confusion" and because "[c]urrent Maryland statutes have different provisions regarding certain types of multiple[-]party deposit accounts for savings and loan associations, on the one hand, and banking institutions, on the other hand." Id. Radowich posited that Senate Bill 756 provided a solution by setting forth "[c]lear and practical rules" establishing "four types of accounts, and stipulating the legal rights of the parties to the account." Id.

In sum, FI § 1-204's legislative history demonstrates that the General Assembly's intent was to abrogate common law distinctions between gift and trust established in

- 24 -

Milholland I and Milholland II, and to erase the uncertainty that often accompanied the death of a party to a multiple-party account as to who was entitled to funds in the account. Our reading of FI § 1-204's legislative history is consistent with Stanley, 175 Md. App. at 264, 927 A.2d at 51, in which the Court of Special Appeals stated:

> The history of [FI § 1-204] and its declared purpose make plain that the overriding intent of the [General Assembly] was to abrogate the common law rules concerning donative intent established by *Milholland I* and *II*, and to provide unequivocally that, in the absence of an account agreement that states otherwise, upon the death of one of the parties to a multiple-party account[,] the survivors own the funds in the account.

At bottom, the General Assembly enacted FI § 1-204 to extinguish confusion regarding ownership rights of the funds in a multiple-party account following the death of one of the parties—as is evidenced by the concerns about survivorship rights expressed in House Bill 956's file. In enacting FI § 1-204, the General Assembly eliminated the need to resort to extrinsic evidence to establish the donative intent of the deceased.

Upon our review of FI § 1-204's legislative history, including a review of Milholland I, Milholland II, and subsequent case law, it is clear that the context of the common law and resulting enactment of FI § 1-204 concerned the ownership interest in funds contained in a joint or multiple-party account following the death of one of the parties, and not the ownership interests among living parties to a joint or multiple-party account. Stated otherwise, neither the common law as developed through Milholland I, Milholland II, and their progeny, nor FI § 1-204 or its legislative history, demonstrates an intent to implicate the ownership interests among living parties to a joint or multiple-party account or to otherwise affect any agreement that may exist among living parties

concerning the ownership interest in funds in the account. Instead, FI § 1-204(f) simply grants a party or a convenience person to a joint or multiple-party account the authority to access the account and withdraw funds, absent language in the account agreement expressly providing otherwise.

Because we hold that FI § 1-204(f) does not confer ownership rights to the funds in a joint or multiple-party account—*i.e.*, a party to a joint or multiple-party account is not an "owner" of the funds in the account by virtue of the circumstance that he or she has the authority to withdraw funds from the account—we perceive no merit in Wagner's reliance on CR § 7-110(a)[17] for the contention that Wagner, as an alleged "joint owner" of the Account, cannot be convicted of theft. As Chief Judge Barbera pointed out during oral argument, such a position presupposes that Wagner was a joint owner of the funds in the Account in the first place.

Moreover, because neither FI § 1-204(f) nor FI § 1-204 as a whole implicates ownership of funds in a joint or multiple-party account where the parties to the account are alive, our holding is not inconsistent with that of the Court of Special Appeals, which

---

[17]CR § 7-110(a) provides, in pertinent part:

(1) It is not a defense to the crime of theft that the defendant has an interest in the property that was the subject of the theft if another also has an interest in or right to possess the property that the defendant is not entitled to infringe.

(2) In determining the right of possession:

(i) a joint or common owner of the property does not have a right of possession of the property that is superior to the right of any other joint or common owner of the property[.]

- 26 -

concluded as follows:

> In approaching ownership of a bank account prior to the death of one of the parties, the current state of the law requires us to look to the intent of [Father] and determine if he intended to make an irrevocable gift of ownership of the [A]ccount. . . . [T]itling an account as 'joint owners' presumptively creates an ownership interest in both parties, but that presumption can be rebutted by evidence of a contrary intent of the original owner of the account.

Wagner, 220 Md. App. at 190, 102 A.3d at 909-10; see also Morgan Stanley & Co., Inc. v. Andrews, ___ Md. App. ___, ___ A.3d ___, No. 935, Sept. Term, 2014, 2015 WL 5735268, at *1 (Md. Ct. Spec. App. Oct. 1, 2015) (In a case involving "the extent to which a creditor of one joint account holder may garnish funds in a joint account when another joint accountholder is a non-debtor[,]" the Court of Special Appeals held "that there is a rebuttable presumption that joint account holders own the funds in an account, but [] the presumption of joint ownership can be rebutted by clear and convincing evidence to the contrary.").

Even if a rebuttable presumption of equal ownership of funds among parties to a multiple-party account exists, we hold that the evidence adduced at trial rebutted that presumption in this case. As the circuit court found, Father added Wagner to the Account, and Wagner added Father to her personal checking account, "for the sole purpose of [e]nsuring that the funds could be accessed if necessary. . . . [B]ut [Father]'s money was [Father]'s money and [] Wagner's money was [] Wagner's money[.]" And, as Father testified, the funds in the Account were his funds—not Wagner's—and he added Wagner to the Account "only . . . for [him] to get [his] money out if [he] couldn't"; Father testified that Wagner agreed to this arrangement. Thus, the circuit court correctly determined that

Wagner was not an owner—joint or otherwise—of the funds in the Account; instead, Father was the owner of the funds. Again, that the signature card submitted to the bank identified Wagner as a "joint owner" of the Account is not dispositive of Wagner's ownership interest; both Father and Wagner testified that the funds in the Account were Father's, and that it was understood that the funds were to be withdrawn only upon Father's direction and on his behalf. Stated otherwise, the existence of an agreement between Father and Wagner rebutted any presumption that Wagner, as a party to the Account, had an ownership interest in the funds; *i.e.*, the titling of the Account, listing Father and Wagner as "joint owners," did not create an ownership interest in the funds in the Account, as Father and Wagner agreed that the funds belonged to Father. Put simply, the terms of the agreement between Father and Wagner governed their respective ownership rights, or lack thereof, as parties to the funds in the Account.

Moreover, we agree with the State that Wagner's strained interpretation of FI § 1-204(f) would effectively render FI § 1-204(d) meaningless and lead to inconsistent outcomes under FI § 1-204(f) and FI § 1-204(d). FI § 1-204(d) addresses ownership of funds in a multiple-party account after the death of a party to a multiple-party account, and provides, in relevant part, for joint ownership of funds by the surviving parties unless another agreement exists. See FI § 1-204(d)(2) ("If the account agreement does not expressly establish the right to funds in the account upon the death of a party, or if there is no account agreement, any funds in the account upon the death of a party shall belong to the surviving party or parties."). To interpret FI § 1-204(f) as Wagner urges—*i.e.*, that the right to withdraw funds from a multiple-party account constitutes an ownership interest in

- 28 -

those funds—would, in the case of an multiple-party account to which there are three or more parties, permit one surviving party to a multiple-party account to withdraw all funds from the account upon the death of one party, and thus eliminate the other parties' ownership rights to the funds in the account. This interpretation runs counter to FI § 1-204(d)'s plain language. In Stanley, 175 Md. App. at 260, 265, 927 A.2d at 49, 51-52, the Court of Special Appeals reached the same conclusion when addressing the interplay between FI § 1-204(d) and FI § 1-204(f), explaining:

> [FI § 1-204](f) allows any owner of the multiple-party account to withdraw funds from it, but that right of withdrawal does not supersede [FI § 1-204](d), which grants survivorship rights (and thus ownership rights) to all of the parties to the account who survive the death of one of them.
>
> . . .
>
> [T]he legislative history and the declared purpose of [FI § 1-204] resolve any possible ambiguity concerning how FI § 1-204(d) and (f) should be construed. Although any party to a multiple-party account may withdraw funds under FI § 1-204(f), that right of withdrawal does not create an ownership interest in the funds withdrawn that overrides the ownership interest of the remaining survivors to the account, established by FI § 1-204(d). Furthermore, the rebuttable presumption of a gift that was available at common law has been abrogated by [FI § 1-204]. Consequently, it is no longer relevant to the issue of survivorship whether the donor intended to create the right of survivorship in the title-holder.

In short, viewing the evidence in the light most favorable to the State, we hold that the evidence was sufficient to support Wagner's conviction for theft of property with a value of at least $500. Because FI § 1-204(f) does not mention or implicate the ownership rights among living parties to a joint or multiple-party account, and instead provides that a party to a joint or multiple-party account may access and withdraw funds in the account, we reject Wagner's contention that she had an ownership interest in the funds in the

Account and that, as a matter of law, she cannot be guilty of theft. Plainly put, under the circumstances of this case, nothing in FI § 1-204(f) prevents a conviction for theft. The evidence demonstrated that Wagner willfully or knowingly obtained or exerted unauthorized control over the funds in the IRA and the Account—which belonged to Father, the owner of the funds—without Father's knowledge or consent, and with the intent to deprive Father of those funds. In other words, the evidence was sufficient to demonstrate that Wagner committed theft.[18]

Our holding—that a party to a joint or multiple-party account may commit theft from that account—is in accord with holdings from other jurisdictions. For example, in Hicks v. State, 419 S.W.3d 555, 559 (Tex. Ct. App. 2013), the Court of Appeals of Texas held that the evidence was sufficient to support a conviction for appropriation of property with a value between $20,000 and $100,000 without the owner's effective consent under Tex. Penal Code Ann. § 31.03, where a defendant who was added to her father-in-law's account "for purposes of expending the monies on behalf of her elderly father-in-law" took

---

[18]Because we determine that there is no ambiguity in the language of either CR § 7-104(a) or FI § 1-204(f), Wagner's contention that this Court should apply the rule of lenity and construe any ambiguities against the State is without merit. See, e.g., Oglesby v. State, 441 Md. 673, 676, 109 A.3d 1147, 1149 (2015) ("When a court construes a criminal statute, it may invoke a principle known as the 'rule of lenity' when the statute is open to more than one interpretation and the court is otherwise unable to determine which interpretation was intended by the [General Assembly]. Instead of arbitrarily choosing one of the competing interpretations, the court selects the interpretation that treats the defendant more leniently. The rule of lenity is not so much a tool of statutory construction as a default device to decide which interpretation prevails when the tools of statutory construction fail."); Gardner v. State, 344 Md. 642, 651, 689 A.2d 610, 614 (1997) ("An ambiguous penal statute is subject to the 'rule of lenity,' which requires that such statutes be strictly construed against the State and in favor of the defendant." (Citations omitted)). Here, the rule of lenity does not apply.

and used funds from the account without the father-in-law's authorization. The Court observed that it was undisputed that funds in the account derived from "deposits [] made by [the] father-in-law or consisted of monies owned by him before deposit." Id. In rejecting the defendant's contention that, because she was a party to a joint account, she owned the funds therein and could not be guilty of theft, see id. at 557, the Court explained:

> [I]t is not at all unusual for a person to deposit his or her funds into an account upon which another person is authorized to draw merely for the convenience of the depositor. In such situations, the owner of the money intends only to facilitate disbursement of the funds for his or her own purposes, not to transfer title to the co-signator on the account. Thus, the creation of a joint account does not necessarily create ownership in the co-signator of the account. From this, we conclude that a party to a joint account is entitled to lawfully draw monies from the account. That authority alone, however, does not establish the party's ownership of the funds. Nor does it alone divest title to the funds from the actual owner.

Id. at 558-59 (citations, internal quotation marks, brackets, and ellipsis omitted).

As another example, in State v. Gagne, 79 A.3d 448, 456 (N.H. 2013), the Supreme Court of New Hampshire held that "the evidence was sufficient to prove that [a] defendant was not privileged to infringe upon [a] victim's interest in [] funds in [a] joint account for the defendant's own use[,]" i.e., that the evidence was sufficient to support the conviction for theft by unauthorized taking.[19] In Gagne, 79 A.3d at 450-51, the defendant and the victim, who were friends, opened a joint bank account; "[t]he victim understood that the purpose of the joint account was to allow the defendant to better assist her with paying bills

---

[19]As the Court explained, N.H. Rev. Stat. Ann. § 637:3 provided that "a person is guilty of the crime of theft by unauthorized taking 'if he obtains or exercises unauthorized control over the property of another with a purpose to deprive him thereof.'" Gagne, 79 A.3d at 452.

or cashing checks. The victim never told the defendant that she could take money from the joint account for her own use." Nevertheless, large sums of money were transferred from the victim's other accounts into the joint account, and the defendant withdrew a large sum of money from the joint account and deposited it into her own accounts. See id. at 451.

On appeal, the defendant contended that the evidence was insufficient to support the conviction of theft by unauthorized taking because the State failed to demonstrate that the property in the joint account was "property of another" under the theft statute. See id. at 454. The Court rejected that argument, noting that the statute defined "property of another" as "'property in which any person other than the actor has an interest which the actor is not privileged to infringe, regardless of the fact that the actor also has an interest in the property,'" and concluding that "[t]he plain language of the statute [] support[ed] the conclusion that the definition of '[p]roperty of another' includes a joint bank account." Id. (citations omitted) (last alteration in original). The Court stated: "With respect to a joint account, if the arrangement does not provide one owner of the account with a privilege to take funds from the account in the circumstances under which that owner withdrew them, that owner may be convicted of stealing 'by unauthorized withdrawals from the account.'" Id. at 455 (citation omitted). The Court concluded that the evidence was sufficient to support the theft conviction and to demonstrate "that the funds in the joint account were the '[p]roperty of another[,]'" explaining:

> The defendant argues that the terms of the account did not require the victim's permission for her to withdraw funds from the account. The fact that the defendant did not need the victim's permission in order to withdraw

- 32 -

funds from the account, however, does not mean that the defendant was privileged to appropriate the victim's interest in those funds. Here, the victim testified that the purpose of the joint account was to allow the defendant to better assist her with "big bills." The victim further testified that she never authorized the defendant to make withdrawals from the joint account for her own needs.

Id. at 456.

As demonstrated by the cases discussed above, that a party to a joint or multiple-party account may commit theft from that account is not a new or novel holding.[20] In line

---

[20]To the extent that courts in other jurisdictions have held that a party to a joint or multiple-party account cannot commit theft from the account, such cases are distinguishable and unpersuasive. For example, in State v. Haack, 713 P.2d 1001, 1003 (Mont. 1986), the Supreme Court of Montana held that Montana "[s]tatutes and case law demonstrate that a joint tenancy bank account is [] a special relationship between co-owners . . . [that] precludes application of the theft laws[,]" such that "[t]he special relationship between co-owners in a joint tenancy bank account cannot have any 'unauthorized control' or 'interest to which offender is not entitled' by a joint tenant." In Haack, id. at 1001, the defendant contracted with two homeowners to construct a house for them; the homeowners deposited funds in a joint checking account in which one of the homeowners and the defendant "were joint tenants authorized to draw from the account." The defendant began drawing funds from the joint account, however, for unauthorized personal purposes instead of construction costs. See id. at 1001-02. The trial court concluded as a matter of law that the defendant could not be convicted of theft "because he was a joint tenant" on the account, and the Supreme Court of Montana agreed. Id. at 1002-03. Key to the Supreme Court of Montana's decision, though, was the development through Montana case law of the principle that a "joint tenancy bank account" creates "a special relationship" among the parties to the account such that one cannot be convicted of "theft of joint tenancy bank account property." Id. at 1002. The same principle has not developed in Maryland case law with respect to FI § 1-204.

As another example, in Breinig v. Harkness, 872 N.E.2d 155, 156-57, 160 (Ind. Ct. App. 2007), in a civil lawsuit between two step-brothers, Breinig and Harkness, concerning Harkness's mother's voluntary transfer to Harkness of money from a joint checking account belonging to Harkness's mother and Breinig's father, the Court of Appeals of Indiana held that Harkness had not committed civil conversion or theft because he did not exert unauthorized control over the funds, which were given to him by Harkness's mother. In Breinig, Harkness's mother gave the funds to Harkness, who was not a party to the joint checking account; by contrast, here, Father did not give the funds in the Account to

with the plain language of the statutes at issue, the legislative history, and case law, we

hold that the evidence was sufficient to support Wagner's conviction for theft of property

with a value of at least $500, and that FI § 1-204(f) did not confer an ownership interest to

Wagner that prevented her from being found guilty of theft.[21]

## II.

Wagner contends that the evidence is insufficient to support the conviction for

embezzlement (fraudulent misappropriation by fiduciary) because the State failed to prove,

and the circuit court never found, that she was a fiduciary. Wagner argues that having

access to the Account as a joint owner of the Account did not make her a fiduciary.

The State responds that the evidence is sufficient to support Wagner's conviction

---

Wagner. Wagner's reliance on <u>Breinig</u> is unpersuasive, as the case is factually distinct from this case.

[21]Nothing in our opinion alters the bar against prosecution of an individual for theft from his or her spouse where the individual and his or her spouse live in the same residence as husband and wife. Indeed, the bar against prosecution under those circumstances is codified at CR § 7-110(c)(3), which provides that "[i]t is a defense to the crime of theft that . . . the property involved was that of the defendant's spouse, unless the defendant and the defendant's spouse were not living together as husband and wife and were living in separate residences at the time of the alleged theft[.]" In other words, so long as the individual and his or her spouse live in the same residence as a husband and wife, the individual cannot be guilty of theft from his or her spouse. We note that there are any number of questions concerning CR § 7-110(c)(3)'s effect that are not before this Court in this case. For example, any concern that, to avoid prosecution for theft, an individual who is about to cease residing in the same residence with his or her spouse will take assets before leaving the marital residence with the intent to deprive the spouse of those assets, is not before this Court. Whether such a scenario constitutes theft would be a matter of first impression not presented by the circumstances of this case and, as such, resolution of the issue must await another day. Similarly, we note that CR § 7-110(c)(3) has not been amended or updated to reflect the legality of same-sex marriages in Maryland since 2013, and still refers to married couples as those couples "living together as husband and wife[.]" Although, for guidance, we observe that from our perspective CR § 7-110(c)(3) would apply to married same-sex couples, that matter is not before this Court in this case.

for embezzlement (fraudulent misappropriation by fiduciary). The State contends that a fiduciary relationship includes both formal, business fiduciary relationships and informal relationships in which one person places trust in, and relies upon, another for his or her affairs. The State argues that, by allowing Wagner to access his account at his direction and on his behalf, Father created in Wagner a relationship "implying and necessitating great trust[,]" *i.e.*, a fiduciary relationship. (Citation and internal quotation marks omitted). According to the State, it was the trust and confidence between Father and Wagner as father and daughter that led Father to add Wagner to the Account in the first place.

CR § 7-113(a), concerning embezzlement (fraudulent misappropriation by fiduciary), provides:

A fiduciary may not:

(1) fraudulently and willfully appropriate money or a thing of value that the fiduciary holds in a fiduciary capacity contrary to the requirements of the fiduciary's trust responsibility; or

(2) secrete money or a thing of value that the fiduciary holds in a fiduciary capacity with a fraudulent intent to use the money or thing of value contrary to the requirements of the fiduciary's trust responsibility.

In Andresen v. State, 24 Md. App. 128, 148-49, 331 A.2d 78, 93-94, cert. denied, 274 Md. 725 (1975), aff'd, 427 U.S. 463 (1976), in discussing the crime of fraudulent misappropriation by a fiduciary (then codified at Md. Code Ann., Art. 27, § 132, CR § 7-113(a)'s predecessor) and what "fiduciary capacity" means for purposes of the statute, the Court of Special Appeals stated:

*Black's Law Dictionary* (4th Ed., 1951), defines "Fiduciary Capacity" as follows:

"One is said to act in a 'fiduciary capacity' or to receive money or contract a debt in a 'fiduciary capacity,' when the business [that] he transacts, or the money or property [that] he handles, is not his own or for his own benefit, but for the benefit of another person, as to whom he stands in a relation[ship] implying and necessitating great confidence and trust on the one part and a high degree of good faith on the other part. The term is not restricted to technical or express trusts, but includes also such offices or relations as those of an *attorney at law*, a guardian, executor, or broker, a director of a corporation, and a public officer." (Emphasis supplied.)

The Maryland case law is in complete accord. In *Gaggers v. Gibson*, 180 Md. 609, [613,] 26 A.2d 395, [397,] the Court of Appeals said . . . :

"[A] fiduciary relation exists in every case 'in which there is confidence reposed on one side and the resulting superiority and influence on the other. The relation and the duties involved in it need not be legal; it may be moral, social, domestic[,] or merely personal'."

. . . In *Anderson v. Watson*, 141 Md. 217, [234,] 118 A. 569, [575,] the Court of Appeals said . . . :

"A 'fiduciary' or 'confidential' relation, when used in the same connection, exists 'in all cases where there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing the confidence. The rule embraces both technical fiduciary relations, and those informal relations which exist wherever one man trusts in and relies on another; the origin of the confidence imposed is immaterial'."

The language of [CR § 7-113(a)'s predecessor] indicates to us a clear legislative intent to extend the proscription of the embezzlement laws to those who breach a fiduciary trust as above defined.

Here, we hold that the evidence was sufficient to support the conviction for embezzlement (fraudulent misappropriation by fiduciary). As an initial matter, we note that the Court of Special Appeals declined to address this issue "because the misappropriation [conviction] merged into the theft" conviction for sentencing purposes.

- 36 -

Wagner, 220 Md. App. at 177 n.1, 102 A.3d at 901 n.1. Despite the circumstance that—for sentencing purposes—the conviction for embezzlement (fraudulent misappropriation by fiduciary) merged with the conviction for theft, the conviction for embezzlement (fraudulent misappropriation by fiduciary) remains; thus, it is appropriate for this Court to consider the sufficiency of the evidence to support the conviction.

We hold that the evidence was sufficient to demonstrate that Wagner was a fiduciary in connection with the funds in the Account. To be sure, as Wagner points out, she was not a fiduciary by virtue of any formal, professional undertaking, such as that undertaken by an accountant or an attorney. A formal, professional relationship, however, is not required to create a fiduciary relationship. See Andresen, 24 Md. app. at 149, 331 A.2d at 93-94. Here, the evidence adduced at trial established that Father added Wagner to the Account for the sole purpose of "get[ting his] money out if [he] couldn't [,]" *i.e.*, to access his funds at his direction and on his behalf, and not for Wagner's own benefit or on her own accord. Both Father and Wagner knew that the funds in the Account were Father's. By permitting Wagner to access funds in the Account at his direction and on his behalf, Father, in essence, created with Wagner "a relation[ship] implying and necessitating great confidence and trust on the one part and a high degree of good faith on the other part."[22] Andresen, 24 Md. App. at 148, 331 A.2d at 93 (citation omitted). Indeed, it is evident from

---

[22]This opinion, of course, does not stand for the proposition that parties to a joint or multiple-party account are automatically fiduciaries in connection with funds in the account simply by virtue of being a party to the account; instead, whether a party to a joint or multiple-party account is a fiduciary in connection with funds in the account is a case-by-case determination.

Father's testimony that, without the arrangement agreed to by Father and Wagner—that Wagner was to withdraw funds from the Account only at Father's direction and on his behalf—Wagner would not have been added to the Account. It was Father's familial relationship with Wagner, and the trust and confidence such a relationship engenders, that was a key factor leading to Father's arrangement with Wagner with respect to the Account. We conclude that the evidence showed that Wagner was a fiduciary in connection with the funds in the Account. Accordingly, we hold that the evidence was sufficient to support the conviction for embezzlement (fraudulent misappropriation by fiduciary).[23]

> **JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. PETITIONER TO PAY COSTS.**

---

[23]Again, simply being a party to a joint or multiple-party account does not necessarily make that party a fiduciary. We hold only that, under this case's circumstances, and in particular under the arrangement agreed to between Father and Wagner, the evidence was sufficient to demonstrate that Wagner was a fiduciary in connection with the funds in the Account.

Circuit Court for Baltimore County,
Maryland
Case No. 03-K-13-001058
Argued: September 28, 2015

IN THE COURT OF APPEALS
OF MARYLAND

No. 11

September Term, 2015

_____

JACQUELINE WAGNER

v.

STATE OF MARYLAND

_____

Barbera, C.J.
Battaglia
Greene
Adkins
McDonald
Watts
Harrell, Glenn T., Jr.
(Retired, Specially
Assigned)

JJ.

_____

Dissenting Opinion by Battaglia, J.,
which Barbera, C.J. and Adkins, J., join

_____

Filed: December 17, 2015

"Great cases, like hard cases, make bad law. For great cases are called great, not by reason of their real importance in shaping the law of the future, but because of some accident of immediate overwhelming interest which appeals to the feelings and distorts the judgment."[1]

- Oliver Wendell Holmes, Jr.

I respectfully dissent. Though the facts to which Marion Wagner, the father, testified may generate feelings of sympathy for Mr. Wagner, and appall at the actions taken by Ms. Wagner, the outcome reached by the Majority—concluding that a joint owner of an account can be guilty of theft and embezzlement—does nothing to soften the emotions and creates a dangerous precedent. The decision of the Majority creates havoc because now a joint owner can orally criminalize withdrawals from a joint account, which in its establishment and maintenance did not reflect the post hoc limitations testified to in this case. Family relationships, forever complicated, henceforth could engender criminal sanctions were a parent to become disenchanted with a child who is a joint owner. Indeed, the notion of a rebuttable presumption of ownership with regards to joint accounts that may be overcome post hoc through parol evidence, in light of the comprehensive framework for multiple-party accounts established under Section 1-204 of the Financial Institutions Article, is perplexing.

Section 1-204 of the Financial Institutions Article of the Maryland Code (1980, 2011 Repl.Vol.) defines multiple-party accounts and sets forth the rights and ownership interests of parties and non-parties in joint accounts, both while all parties are living and upon the death of one of the parties. The statute defines a "joint account" as "any account

---

[1] Northern Securities Co. v. United States, 193 U.S. 197, 364, 24 S. Ct. 436, 468, 48 L. Ed. 679, 726 (1904) (Holmes, J., dissenting)

other than a P.O.D. account or a trust account established in the name of 2 or more parties[]", *id.* at § 1-204(b)(7), and includes a "joint account" under the definition of a multiple-party account. *Id.* at § 1-204(b)(8)(i)(1). A "party" is defined as "any person who, by the terms of the account agreement, possesses a present right to draw upon funds in a multiple-party account." *Id.* at § 1-204(b)(9)(i). Section 1-204(f) provides for the right to withdraw finds from the joint account, stating:

> Unless the account agreement expressly provides otherwise, the funds in a multiple-party account may be withdrawn by any party or by a convenience person for any party or parties, whether or not any other party to the account is incapacitated or deceased.

In the present case, the trial judge found that the accounts created by Mr. Wagner and his daughter, Jacqueline Wagner, were joint accounts, that Ms. Wagner was a party to and joint owner of the accounts—but not of the funds contained therein—and that she was authorized under Section 1-204(f) of the Financial Institutions Article to withdraw funds from the accounts.

The Majority, interpreting Section 1-204(f), states that "§ 1-204(f) does not create an interest in property or give ownership of property to the party authorized to withdraw." Maj. Slip Op. at 15. To the contrary, however, absent some written limitation, a joint owner of an account possesses an ownership interest in the funds, because by its very nature a joint account establishes each party's right to all of the funds within the account. *See* Black's Law Dictionary 22 (10th ed. 2014) ("[J]oint account" is defined, in pertinent part, as "A bank or brokerage account opened by two or more people, by which each party has a present right to withdraw all funds in the account[.]").

2

What is most important is that Section 1-204 also provides for other types of accounts, which limit the use of the funds by the persons identified on the account. One of those account types—a convenience account—was the type about which Mr. Wagner testified and is obviously what he intended to create but did not, an account for his "convenience".[2] The designation of a "convenience person" on the account provides that person with authorization to withdraw funds on behalf of a party, pursuant to Section 1-204(b)(5):

> "Convenience person" means any person who is authorized to draw upon funds in an account:
> (i) Under a power of attorney given by 1 or more parties to the account; or
> (ii) By virtue of a designation in the account agreement appointing that person as agent of a party or the parties to the account for the convenience of the party or parties.

A "convenience person" is expressly excluded from the definition of a "party" on a joint account under Section 1-204 (b)(9)(iii). A "convenience person", while authorized to withdraw funds from the account on behalf of a party, maintains no ownership interest in the funds held in the account, as provided by Section 1-204(i):

> (1) A person who has an ownership interest in an account that is *not a multiple-party account* may designate another person as a convenience person on that account.
> (2) No funds in the account shall belong to any convenience person by reason of that capacity.

---

[2] The convenience account, generally, allows for a co-holder to have access to and withdraw funds from the account, but does not give that person an ownership interest in the funds contained in the account. *See* Lisa R. Mahle, *A Purse of Her Own: The Case Against Joint Bank Accounts*, 16 Tex. J. Women & L. 45, 64 (2006).

Md. Code. Ann., Fin. Inst. § 1-204(i) (emphasis added). Under the Majority's ruling, however, the joint account created by the Wagners is converted into a convenience account for the purpose of criminalizing Ms. Wagner's actions.

In the present case, Mr. Wagner established a joint account, which was not a convenience account, nor one that included any limitation on withdrawals in the account agreement itself. As a result, Ms. Wagner could withdraw money from the joint account without peril of being prosecuted for theft.

The Majority suggests, however, were my reasoning followed that subsection (d) of Section 1-204 would be rendered meaningless "and lead to inconsistent outcomes under FI § 1-204(f) and FI § 1-204(d)."[3] Maj. Slip Op. at 28. The Majority offers the example of a multi-party account with three or more parties where one of the parties dies, and one of the remaining parties withdraws all of the funds from the account, thereby eliminating any ownership interest of the other survivors. In essence, what the Majority is saying is that the survivors have equal rights to the funds in the account after the death of one of the parties, which would be negated were any one of the joint owners to have been able to withdraw all the funds prior to the death of one. It is true that under Section 1-204(d)(2), upon the death of one of the joint owners, each remaining owner becomes

_____

[3] Section 1-204(d) of the Financial Institutions Article provides, in relevant part:
> (1) Upon the death of a party to a multiple-party account, the right to any funds in the account shall be determined in accordance with the express terms of the account agreement.
> (2) If the account agreement does not expressly establish the right to funds in the account upon the death of a party, or if there is no account agreement, any funds in the account upon the death of a party shall belong to the surviving party or parties.

entitled to an equal fractional part of the funds, similar to a tenant in common, because no one party could have, absent an agreement to the contrary, an ownership interest greater than any other party upon the death of a party to a joint account. Md. Code. Ann., Fin. Inst. § 1-204(d)(2). While all parties to a joint account are *living*, however, each has an ownership interest in all of the funds.

My observation is reinforced by the opinion of the Court of Special Appeals in *Stanley v. Stanley*, 175 Md. App. 246, 927 A.2d 40, *cert. dismissed*, 402 Md. 36, 935 A.2d 406 (2007). *Stanley* involved multiple parties to multiple accounts, the death of the "primary" account owner and subsequent family squabble over who owned the remaining account funds. *Id.* at 249, 927 A.2d at 42.

Stanley was the "primary owner" of several accounts on which his brother, Hal, and Stanley's second wife and her daughters were "secondary owners". Upon Stanley's death, his second wife and her daughters withdrew all of the funds from the accounts, totaling some $120,000, and deposited the monies in a separate account in their names only. Stanley's brother, Hal, sued, claiming an ownership interest in the account funds under Section 1-204. The trial court found for the wife and daughters, and Hal appealed. Our intermediate appellate court reversed, opining in the situation of the death of one of the parties to a joint account that:

> Although any party to a multiple-party account may withdraw funds under FI § 1-204(f), that right of withdrawal does not create an ownership interest in the funds withdrawn that overrides the ownership interest of the remaining survivors to the account, established by FI § 1-204(d).

5

*Id.* at 265, 927 A.2d at 51-2. Essentially, then, when one party to a joint account dies the funds in a joint account become the property of each of the survivors who hold the account in a form similar to a tenancy in common with each having a fractional interest in the funds remaining at death.

In support of the conclusion that a joint owner of an account may be convicted of theft of the funds in the account, the Majority finds persuasive two cases from other jurisdictions in which a person was convicted of theft from a joint account. *Hicks v. State*, 419 S.W.3d 555 (Tex. Ct. App. 2013) and *State v. Gagne*, 79 A.3d 448 (N.H. 2013). In *Hicks*, the intermediate appellate court in Texas determined that, despite being "made a joint tenant in the account", Hicks's withdrawal and expenditure of monies from an account established and contributed to solely by her father-in-law constituted theft. 419 S.W.3d at 559. In Texas, however, at the time of *Hicks*, ownership of the monies in a joint account over the lifetime of the participants was defined as:

> A joint account belongs, during the lifetime of all parties, to the parties in proportion to the net contributions by each to the sums on deposit, unless there is clear and convincing evidence of a different intent.

Tex. Rev. Civ. Stat. Ann., Probate § 438(a) (2009).[4] Our statutes do not contain the same provision.

---

[4] The statute was recodified in 2014, without substantive changes:
> During the lifetime of all parties to a joint account, the account belongs to the parties in proportion to the net contributions by each party to the sums on deposit unless there is clear and convincing evidence of a different intent.

Tex. Code Ann., Est. § 113.102.

6

In *Gagne*, the Supreme Court of New Hampshire affirmed a conviction for theft from a joint account. Gagne and her friend opened a joint account with the friend's funds so that Gagne could assist the friend "with paying bills and cashing checks." 79 A.3d at 451. Gagne, subsequently, took a substantial portion of the money from the account and was convicted of theft, as well as misapplication of funds. *Id.* at 451-52. *Gagne* is inapposite because New Hampshire's statutory framework does not provide for the establishment of a "convenience account" or the addition of a "convenience person" to an account, as does our statutory framework, so that parol evidence of what the parties intended could be relevant to establishing that a "convenience account" was created.

The Majority also concludes that, "[b]y permitting [Ms.] Wagner to access the funds in the Account at his direction and on his behalf, Father, in essence, created with Wagner 'a relation[ship] implying and necessitating great confidence and trust on the one part and a high degree of good faith on the other part.'" Maj. Slip Op. at 37, quoting *Andresen v. State*, 24 Md. App. 128, 148, 331 A.2d 78, 93, *cert. denied*, 274 Md. 725 (1975), *aff'd* 427 U.S. 463 (1976). In essence, by the mere creation of a joint account whereby access to funds is permitted by statute, a fiduciary relationship is established, according to the Majority.

I would conclude, however, that a person's status as a joint owner of an account does not confer fiduciary obligations upon any other owner of the account. Section 1-204 contemplates a fiducial ("trust") relationship in the establishment of a multiple-party

7

account—the "trust account."[5] Md. Code Ann., Fin. Inst. § 1-204(b)(8)(i). Under a "trust account", funds are accessible by the trustee, who is a party to the account and who is authorized to withdraw funds under 1-204(f). The beneficiary of the trust account, however, does not possess a present right to withdraw funds from the account, but does stand to receive ownership of the account upon the death of all trustees.[6] *Id.* at § 1-204(b)(4). The trust relationship is established by the account agreement. *Id.* at § 1-204(b)(13)(i)(2). Clearly, in providing for a multiple-party account based on a trust relationship expressly established by the account agreement, the statute provides for an account type, separate from that of a joint account, which may be established with fiducial obligations.

To hold otherwise would provide that, absent an express written agreement, any owner of a joint account could, thereby, then, post hoc, complain that another joint

---

[5] A "trust account" is defined under Section 1-204(b)(13) of the Financial Institutions Article, which provides:
    (i) "Trust account" means any account established in the name of 1 or more parties as trustees for 1 or more beneficiaries where:
        1. None of the beneficiaries is also a trustee;
        2. The trust relationship is established by the account agreement; and
        3. There is no corpus of the trust other than the funds in the account.
    (ii) "Trust account" does not include a:
        1. Trust account under a testamentary trust, declaration of trust, or a trust agreement that has significance apart from the account; or
        2. Fiduciary account arising from a fiduciary relationship.

[6] Section 1-204(b)(4) of the Financial Institutions Article provides:
    "Beneficiary" means any person designated on a trust account as a person:
        (i) To whom the account belongs after the death of all trustees for the account; and
        (ii) Who does not possess a present right to draw upon funds in the account during the lifetime of any trustee for the account.

owner, by withdrawing funds for his or her personal use, violated his or her duty under the alleged fiduciary relationship sufficient to be prosecuted for embezzlement. This conclusion runs counter to the statute, which specifically contemplates the type of trust relationship argued by Mr. Wagner through the creation of a "trust account", rather than a joint account. To impose our highest standard of obligation and responsibility upon parties to a joint account and its access is folly.

I dissent.

Chief Judge Barbera and Judge Adkins authorize me to state that they join the views expressed in this dissenting opinion.